In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 07-2387 & 07-2390

SANJAY ANDONISSAMY,

*Plaintiff-Appellant,*

*v.*

HEWLETT-PACKARD COMPANY,
QWEST COMMUNICATIONS
AND KEN SMITH,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 04 C 2521 & 05 C 3080—**William J. Hibbler**, *Judge.*

ARGUED SEPTEMBER 9, 2008—DECIDED NOVEMBER 7, 2008

Before FLAUM, WILLIAMS, SYKES, *Circuit Judges*.

FLAUM, *Circuit Judge.* Sanjay Andonissamy worked as technician for Hewlett-Packard, assigned to the Qwest Cyber Center in Chicago, Illinois, from April 2001 to June 2003. He brought an employment discrimination suit against Hewlett-Packard in the Northern District of Illinois after his termination, alleging that Hewlett-Packard

created a hostile work environment in violation of Title VII, retaliated against him for reporting the hostile work environment to his superiors, and denied him medical leave in violation of the Family and Medical Leave Act. Andonissamy also sued Qwest for violating his rights under 42 U.S.C. § 1981, and sued Ken Smith, his former supervisor, for assault under Illinois law. The district court dismissed Andonissamy's assault claim after Smith filed a motion to dismiss because the statute of limitations had lapsed, and the remainder of Andomissamy's suit upon the defendants' motion for summary judgment. Andonissamy appeals on the Title VII claims, the § 1981 claim, the Family and Medical Leave Act claim, and the dismissal of the assault claim. For the following reasons, we affirm the district court's grant of the motion for summary judgment and the motion to dismiss.

## I. Background

Sanjay Andonissamy began working for Hewlett-Packard in April 2001, as a systems engineer assigned to the Qwest Cyber Center in Chicago. Andonissamy is a citizen of France of Indian ethnicity, and his employment was based on Hewlett-Packard's sponsorship of his H-1B visa. Classified as a TSG-2 technician, Andonissamy's primary responsibilities included providing technical support to Qwest data centers and to Qwest customers.

Andonissamy and Hewlett-Packard offer divergent accounts of Andonnissamy's tenure with the company.

Andonissamy alleges that, in the wake of September 11, 2001, Smith created a hostile work environment by directing numerous racist comments at Andonissamy, and that he was placed on remedial performance plans either as retaliation for his complaints to human resources about his work environment, or because of his supervisor's personal animus towards him. Hewlett-Packard, on the other hand, alleges that Andonissamy was an abusive and unprofessional co-worker who was terminated after the company gave him numerous warnings about his insubordination and disrespectful comments.

Andonissamy's employment discrimination suit is based on a series of comments from Smith. First, Andonissamy claims that sometime after September 11, Smith said in conversation with Andonissamy that, "All of Asia should be smashed," and used his hands in a way that indicated that he meant South Asia specifically; second, that Smith told Andonissamy that people like him should be hanged from trees as African-Americans had been hanged; third, that people out of college in the United States were unable to find jobs because people like Andonissamy had taken them; fourth, that jobs should be reserved for Americans; fifth, that no matter how much Andonissamy worked he would never be like his co-workers; sixth, that Smith claimed when reviewing resumes that he would look for resumes with American-sounding names. Andonissamy also claims that he was involved in a fight with two co-workers who called Andonissamy an "Indian racist bastard" and who then spoke with Smith after the fight ended.

Andonissamy claims that he expressed his frustration with Smith several times during his tenure with Hewlett-Packard. He sent complaints to Russell Lewis, Smith's supervisor, in October 2002, April 2003, and May 2003. Andonissamy alleges that in October 2002 and May 2003, he was issued performance warnings after complaining to Lewis. Andonissamy finally claims that in May 2003, he was suspended after Smith made a false report to human resources that Andonissamy had said "We will all have a big surprise," a report that Andonissamy claims was designed to make him look like a security threat. Human resources then conducted an investigation into the remark, which Andonissamy claims led to his firing on June 23, 2003.

Andonissamy bases his Family and Medical Leave Act claim on his treatment for depression and anxiety, which began at some point in 2002 and lasted until the end of his employment with Hewlett-Packard in 2003. Smith learned in late 2002 that Andonissamy took medication. Andonissamy claims that his condition worsened after the death of his brother and nephew in March 2003 and April 2003, respectively, and that he was not given leave to attend their funerals. He also missed work on two occasions due to illness in May 2003. While Andonissamy was taking medicine for depression from 2002 to 2003, his treating physician examined him on four separate occasions and did not place any restrictions on his daily activities or work. Nor did his physician diagnose Andonissamy with clinical depression.

Hewlett-Packard offers a different version of events. In January 2002, Andonissamy's supervisor, Ken Smith, gave

him his first performance review. While Smith found that Andonissamy's technical skills were strong, he also noted that Andonissamy could improve his relationships with co-workers and customers. A few months after the first performance review, several of Andonissamy's colleagues complained that Andonissamy had treated them rudely, and Smith informed him of those charges in an e-mail. Another complaint, that Andonissamy had been rude to a Qwest employee in an e-mail, followed shortly thereafter. In October 2002, Smith placed Andonissamy on a performance plan to monitor his work for forty-five days, after a customer of the Qwest Cyber Center had network outages that were partly attributed to Andonissamy.

Hewlett-Packard's concerns about Andonissamy's performance grew. In 2002, Andonissamy refused to train a co-worker to serve as his back-up, despite repeated requests from Smith that he do so. On March 28, 2003, Smith contacted Lewis about an argument he had with Andonissamy when the latter refused to attend an installation for a customer. On March 31, 2003, Carol Dixon-Woolfolk, an employee of Hewlett-Packard's human resources department, began investigating Andonissamy's performance issues. During her investigation, Dixon-Woolfolk interviewed Andonissamy's co-workers, who reported that Smith frequently bore the brunt of Andonissamy's abusive yelling. Those same co-workers testified that Andonissamy screamed at them and talked down to them, sent condescending e-mails to Qwest employees, and failed to meet deadlines or follow instructions.

On April 16, 2003, Dixon-Woolfolk recommended that Hewlett-Packard issue Andonissamy a performance warning. Smith issued this warning on May 5, 2003, although Andonissamy refused to sign it. The warning listed the five most recent examples of insubordination and inappropriate conduct, including two incidents that had caused a Qwest employee to complain to Smith. Andonissamy, in response to the warning, then sent an e-mail to Lewis and Dixon-Woolfolk complaining about Smith. After the warning, Andonissamy continued to submit work late, missed scheduled installations, and refused to train a back-up.

In June 2003, in response to the concerns of Qwest employees about Andonissamy's behavior, Qwest refused to authorize Andonissamy's return to the Cyber Center. Lewis then decided to terminate Andonissamy's employment, which he did on June 23, 2003.

On September 16, 2003, Andonissamy filed a complaint with the Equal Employment Opportunity Commission for national origin discrimination against Hewlett-Packard. While his complaint contained many of the claims he makes in the present lawsuit, it apparently did not include the allegations that Smith had said Indians should be "hung from trees," or that after September 11 all of South Asia should be wiped out. On January 12, 2004, the EEOC dismissed the complaint and issued Andonissamy a right to sue letter.

On April 7, 2004, Andonissamy filed a complaint against Hewlett-Packard, adding a Family and Medical Leave Act complaint on May 23, 2005, and eventually joining both

Qwest and Smith to the complaint. On November 10, 2005, Andonissamy also asserted a cause of action against Smith for assault under Illinois law; on May 18, 2006, the district court granted Smith's motion to dismiss this claim. The district court granted summary judgment for Hewlett-Packard, Qwest, and Smith on May 30, 2007, and Andonissamy now appeals.

## II. Discussion

This court reviews a district court's grant of summary judgment de novo, construing all facts and drawing all reasonable inferences based on those facts in the light most favorable to the non-moving party. *Telemark Development Group, Inc. v. Mengelt*, 313 F.3d 972, 976 (7th Cir. 2002). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Review of a district court's grant of a motion to dismiss is de novo. *Witzke v. Femal*, 376 F.3d 744 (7th Cir. 2004). When ruling on a motion to dismiss under Rule 12(b)(6), the court accepts all well-pleaded allegations as true and draws all reasonable inferences in favor of the plaintiff. *Porter v. DiBlasio*, 93 F.3d 301, 305 (7th Cir. 1996). A statute of limitations defense, while not normally part of a motion under Rule 12(b)(6), is appropriate where "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense, such as when a complaint plainly reveals that an action is

untimely under the governing statute of limitations." *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005).

**A.  The Title VII and 42 U.S.C. § 1981 claims.**

**1.  Title VII claim.**

The first issue is whether the district court properly granted summary judgment to Hewlett-Packard on Andonissamy's hostile work environment claim. "To survive summary judgment on a hostile work environment claim based on national origin, a plaintiff must establish that: (1) he was subjected to unwelcome harassment, (2) the harassment was based on his national origin, (3) the harassment was severe and pervasive enough to alter the conditions of his environment and create a hostile and abusive working environment, and (4) there is a basis for employer liability." *Velez v. City of Chicago*, 442 F.3d 1043, 1047 (7th Cir. 2006). "Title VII protects a worker against conduct which is sufficiently severe or pervasive that a reasonable person would find it hostile and which the victim himself subjectively sees as abusive." *Ngeunjuntr v. Metropolitan Life Ins. Co.*, 146 F.3d 464 (7th Cir. 1998) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993)).

Courts examine a variety of factors when evaluating whether a workplace is hostile, including the frequency of the supposed discriminatory conduct; the severity of it; whether the conduct is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's job performance. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

The district court rejected Andonissamy's hostile work environment claim because it determined that, even assuming Smith had made every comment attributed to him, the comments were insufficient as a matter of law to support a claim for national origin discrimination, and, second, because Andonissamy had not demonstrated a basis for employer liability. Andonissamy argues on appeal that there is sufficient evidence for a jury to find that he was subjected to a hostile work environment. He lists once again Smith's alleged remarks, and argues that they demonstrate an objectively hostile atmosphere based on his national origin. Hewlett-Packard responds that the district court properly found the comments insufficient as a matter of law, and that many of the alleged remarks cannot even be attributed to national origin discrimination.

We do not need to reach the question of whether Smith's comments are sufficient to support a hostile work environment claim. Even assuming arguendo that the remarks created a hostile work environment, Andonissamy has not established a basis for employer liability in this case. Under Title VII, an employer can be vicariously liable for a hostile work environment created by a supervisor, but is only liable for a hostile work environment created by a co-worker if the employer was negligent in discovering or remedying the harassment. *Velez*, 442 F.3d at 1047. A "supervisor" for purposes of Title VII is not simply a person who possesses authority to oversee the plaintiff's job performance, but a person with the power to directly affect the terms and conditions of the plaintiff's employment. *Id*; *see also Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002). In this circuit, the term means

generally a person with "the authority to hire, fire, pro-mote, demote, discipline or transfer . . ." *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004). Smith, while Andonissamy's "supervisor" in the colloquial sense of the word, did not possess the authority that would make him a supervisor for purposes of Title VII. He did not hire or fire Andonissamy, and while he recommended disciplinary action, the record shows that human resources first had to conduct an investigation and issue a recommendation before any disciplinary action could be taken.

Andonissamy argues that Smith directed Andonissamy's performance and recommended disciplinary action to human resources, and thus qualifies as a supervisor for purposes of Title VII. However, as the district court correctly noted in its summary judgment opinion, directing work activities and recommending disciplinary action are not in and of themselves sufficient to make someone a supervisor under Title VII. *See Rhodes*, 359 F.3d at 506. Rather, Andonissamy would have to point to evidence that Smith could directly affect the terms and conditions of his employment. Again, Andonissamy must produce evidence that Smith could hire, fire, promote, demote, discipline or transfer him. Such evidence is simply not in the record. Smith neither hired nor fired Andonissamy; the deposition testimony indicates that Russell Lewis, not Smith, made the deci-sions to hire and fire Andonissamy. Nor could Smith demote or discipline Andonissamy; he could recommend that the company discipline an employee, but such action was subject to an investigation and approval from human resources, and the decision was not up to him.

Andonissamy attempts to establish liability under "cat's paw" doctrine, arguing that Lewis and the human resources department were just a screen for Smith's decisions. The "cat's paw" doctrine does create a basis for employer liability when a single individual lacks the requisite power of a Title VII supervisor. *See Phelan v. Cook County*, 463 F.3d 773, 784 (7th Cir. 2006); *see also Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990). The doctrine is not helpful to Andonissamy in this case, however, because it applies only in those cases where no one individual possesses the powers of a Title VII supervisor (such as the hydra-headed supervisory committee this court reviewed in *Phelan*). In this case, however, Russell Lewis ultimately made the decision to hire and fire Andonissamy, and thus he has the authority of a Title VII supervisor. Additionally, the "cat's paw" doctrine has been applied in cases where committee decisions are not independent and appear to be taken without conducting any real investigation. *See Shager*, 913 F.2d at 405. Here, however, human resources investigated the complaints against Andonissamy before recommending disciplinary action, and there is no evidence that the department was simply a legal smokescreen.

Andonissamy does not establish that Hewlett-Packard is liable for failing to detect or remedy the alleged discriminatory environment. To establish that Hewlett-Packard is liable for failing to remedy a hostile work environment created by co-workers, Andonissamy would need to demonstrate that he notified the employer about the harassment or that the harassment was so pervasive that a jury could infer his employer knew about it. *See Zimmerman v. Cook County Sheriff's Dept.*, 96 F.3d 1017 (7th

Cir. 1996). In his briefs to this court, Andonissamy cites the fight with his co-workers as an instance of national origin discrimination that Hewlett-Packard was negligent for not remedying.[1] This incident, however, was not mentioned in Andonissamy's EEOC letter and the allegation appeared for the first time in this litigation. Even assuming that the claim is not barred, this was a single incident, and Andonissamy does not present evidence that he brought the incident to anyone's attention. While he did send an e-mail to Lewis and to human resources on May 6, 2003 complaining about Smith, this e-mail did not contain allegations of national origin discrimination; the only reference in the e-mail is a reference to Andonissamy's immigrant status, which is not itself a complaint about national origin discrimination and would not establish that Hewlett-Packard is liable for failing to act on the allegation. Accordingly, we affirm

---

[1] This claim is, to put it mildly, problematic. In his opening brief, Andonissamy alleges that he was assaulted at work by two co-workers and cites, in support of this contention, the deposition testimony of Hans Sterlin. The relevant excerpts from the deposition testimony, however, are Sterlin's *denials* that such an attack ever took place. For instance: "Q: Did Bayo hit Sanjay? A: No. Q: Did you hold the door closed while Bayo hit Sanjay? A: No." Sterlin Dep. at 41 (omitting an objection to the form of the second question). Yet Andonissamy cites this testimony as though it is evidence of the claim. Sterlin refers to a verbal altercation in which another co-worker objected to Andonissamy's orders that he print some documents for him; there is nothing in this testimony supporting the claim that the fight was racially motivated or that it escalated beyond a verbal disagreement.

the district court's summary judgment decision on this count.

## 2. § 1981 claim.

When pursuing a § 1981 claim, a plaintiff can proceed by either the direct or indirect method. The direct method requires the plaintiff to produce evidence that the defendants were motivated by animus based upon his national origin when he was denied some employment benefit or suffered some adverse employment action. *Sun v. Board of Trustees of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007). The indirect method requires demonstrating that (1) plaintiff is a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; (4) other similarly situated employees who were not part of the same class were treated more favorably. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007).

While Andonissamy's briefs mention the § 1981 claim, there is nothing in either brief discussing the elements of a claim under either the direct or indirect method. His discussion of the § 1981 claim in his opening brief overlaps entirely with the hostile work environment claim. At any rate, under the direct method Andonissamy has simply not produced evidence that his termination or any other adverse employment action was based on his national origin, and indeed the record indicates that he was terminated only after human resources conducted an investigation into a number of insubordinate incidents and after the company issued him a performance warning re-

garding his conduct. With respect to the indirect method, Andonissamy is unable to meet the second prong of the test based on the available record. Qwest expressed to Hewlett-Packard its concerns about missing documentation regarding their systems, and refused to approve Andonissamy's return to the Cyber Center, and Hewlett-Packard had issued him a performance warning based on a number of incidents between Andonissamy and his supervisors and co-workers. Andonissamy thus cannot demonstrate that he was meeting their legitimate expectations at the time he was fired. Nor did Andonissamy provide evidence demonstrating that other, similarly situated employees from different national origins were treated more favorably. We thus affirm the district court's summary judgment decision on this count as well.

**B.  Retaliation claim.**

Andonissamy's next argument is that the district court improperly dismissed his claim that Hewlett-Packard retaliated against him for notifying superiors about the hostile work environment.

To establish a claim for retaliation, an employee can proceed under one of two methods. Under the direct method, an employee must demonstrate that (1) he engaged in statutorily protected activity; (2) he suffered an adverse action taken by his employer; and (3) there was a causal connection between the statutorily protected activity and the adverse action. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662-63 (7th Cir. 2006). Under the indirect method, a plaintiff must prove that (1) he engaged in statutorily protected activity; (2) he met his

employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Id.*

The district court ruled, first, that Andonissamy could not make a retaliation claim because he never complained to Hewlett-Packard about discriminatory behavior and so never engaged in statutorily protected activity. Second, the court found that the timing of Hewlett-Packard's actions was not suspicious, as the record indicated that Andonissamy complained about Smith on May 6, 2003, which was the day *after* Smith served him with a performance warning based on Dixon-Woolfolk's investigation.

Andonissamy argues that he can prove his retaliation claim via the direct method. He claims that his e-mail to Lewis on May 6, 2003, which makes reference to his immigrant status, was sufficient to constitute a report of discrimination under Title VII. Andonissamy also argues that the timing of his termination, after Dixon-Woolfolk had completed her investigation of Smith, was suspicious. Andonissamy's May 6, 2003 e-mail does contain a litany of complaints about Ken Smith, about Andonissamy's work schedule, and about his high-pressure client work, but nothing that a reader would interpret as a complaint of national origin discrimination. While a report of discrimination to a supervisor may be statutorily protected activity under Title VII, the report must include a complaint of national origin discrimination or sufficient facts to raise that inference. *See*

*Tomanovich*, 457 F.3d at 663; *see also Sitar v. Indiana Dept. of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003).

In his deposition, Andonissamy admitted that he did not include his complaints about national origin discrimination in his correspondence with Lewis and human resources but planned to mention those complaints if anyone from the human resources department contacted him during an investigation. At best, this raises an inference that Andonissamy planned to engage in statutorily protected activity, but it does not amount to statutorily protected activity in its own right.

Moreover, with respect to the third element of this claim, Andonissamy's purported causal connection arises from nothing more than suspicious timing. However, this circuit has held that "[s]uspicious timing alone rarely is sufficient to create a triable issue." *Tomanovich*, 457 F.3d at 665. On summary judgment, in particular, "it is clear that mere temporal proximity is not enough to establish a genuine issue of material fact." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004). Thus, even if this court were to accept that Andonissamy's e-mail was a complaint of national origin discrimination, he could not produce a genuine issue of material fact for trial. This is particularly true since the report in this case occurred after Andonissamy had already received a performance warning for the very same conduct that ultimately led to his termination. Nor could Andonissamy make a retaliation claim under the indirect method, given the ongoing complaints about his job performance and his inability to demonstrate that he was meeting

his employer's legitimate expectations at the time of his termination.

Finally, there is the issue of whether this claim is procedurally barred because of Andonissamy's failure to make a retaliation charge in his EEOC letter. Under the law of this circuit, "a Title VII plaintiff may bring only those claims that were included in her EEOC charge." *McKenzie v. Ill. Dept. of Transp.*, 92 F.3d 473, 481 (7th Cir. 1996). Andonissamy concedes in his reply brief that his original complaint to the EEOC did not include a retaliation claim. However, he claims that the retaliation claim grew out of his original allegations, and that he included the allegations in a letter to the EEOC. Hewlett-Packard anticipated this contention in their response brief, cited *Cheek v. Western Life Ins. Co.*, 31 F.3d 497, 502-03 (7th Cir. 2000), and argued that under the law of this circuit, subsequent letters to the EEOC can only "clarify or amplify" allegations in the original complaint, and cannot state additional complaints. *Id.* (citing 29 C.F.R. § 1601.12(b)). The applicable regulations do hold that an amendment to a complaint can allege "additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge." 29 C.F.R. § 1601.12(b). However, the retaliation claim at issue here arose from Andonissamy's termination, which involves conduct different from the hostile work environment claim that Andonissamy raised in his EEOC complaint. The additional complaint thus does not grow out of the allegations in the initial complaint, and they are related to the allegations only insofar as they involve some of the same supervisors

and the same job. Ultimately, however, we need not decide whether Andonissamy's claim is barred, because he fails to present evidence raising a material issue of fact on the elements of his claim. Accordingly, we affirm the district court's decision on summary judgment.

### C. Family and Medical Leave Act claim.

Andonissamy next argues that the district court improperly dismissed his claim that Hewlett-Packard denied him leave under the Family and Medical Leave Act. The district court dismissed this claim at summary judgment for two reasons. First, because the record indicated that Andonissamy's treating physician had never placed any restrictions on his daily activities or his work, and that he was not diagnosed with clinical depression. Second, because while Andonissamy correctly argued that the FMLA entitles employees to periodic leave, he made no allegation that his doctor believed he required intermittent leave, or that he himself believed that he required intermittent leave.

Hewlett-Packard argues that this claim fails because Andonissamy never requested intermittent leave under the FMLA. Andonissamy argues in his appellate briefs that his failure to request leave is irrelevant, as the change in his behavior was sufficient to place Hewlett-Packard on notice that he needed intermittent leave. There is some authority for the idea that an employee's conduct can put an employer on notice of the need for leave. *See Byrne v. Avon Products, Inc.*, 328 F.3d 379 (7th Cir. 2003); *see also Stevenson v. Hyre Electric Co.*, 505 F.3d 720 (7th Cir. 2007). In

those cases, an employer had adequate notice of an employee's need for intermittent leave based on a sudden change in circumstances. However, both of these cases involved dramatic and sudden changes in an employee's behavior, and requests for at least minimal leave time. Neither of those factors applies in the present case. Andonissamy had been reprimanded throughout his employment with Hewlett-Packard for his inappropriate behavior, and so there was no dramatic change when he began taking depression medication. Moreover, the closest thing that Andonissamy made to a request for medical leave was a request for time off to attend his nephew's funeral in India. This was not a request for sick time, however, and it is difficult to construe this as a request for FMLA leave. We thus affirm the district court's summary judgment order on this claim because Andonissamy did not give Hewlett-Packard notice of any need for FMLA leave.

### D. Whether Andonissamy's assault claim related back to the original pleading.

Andonissamy finally argues that the district court improperly dismissed his assault claim against Smith under Rule 12(b)(6) because it was barred by the Illinois statute of limitations. Andonissamy argues that the claim relates back to the time of the original filing under Federal Rule of Civil Procedure 15(c), because his original complaint and second amended complaint alleged physical intimidation and harassment by Ken Smith. However, Ken Smith was not named as a defendant in

this lawsuit until October 2005, some five months after Illinois' two-year statute of limitations for assault claims expired. *See* 75 ILCS 5/13-202. As Hewlett-Packard correctly points out, the amended complaint also involved not only a new defendant but a new claim against a new defendant.

Federal Rule of Civil Procedure 15(c)(3) permits a claim against a new defendant to relate back to an original timely pleading for purposes of the statute of limitations only if there was an identity mistake as to the proper party to be named and that mistake is chargeable to the new defendant. What we have in this case, however, is a straightforward assault claim made against a defendant who was Andonissamy's supervisor for two years; there is no chance of a genuine identity mistake here, nor does Andonissamy allege one. The district court properly dismissed the claim.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's order of summary judgment.