In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1671

AUTUMN TIBBS,

*Plaintiff-Appellant*,

*v.*

ADMINISTRATIVE OFFICE OF THE ILLINOIS COURTS,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Central District of Illinois.
No. 13-3193 — **Richard Mills**, *Judge*.

ARGUED APRIL 25, 2017 — DECIDED JUNE 19, 2017

Before POSNER, KANNE, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Plaintiff Autumn Tibbs worked as an administrative assistant in the Illinois court system. She was suspended the day she returned to work after taking leave under the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 et seq. She was then fired after she chose not to attend a disciplinary meeting. Tibbs sued the Administrative Office of the Illinois Courts. She contends that this agency employed her and that she was fired in retaliation for taking

FMLA leave. The district court granted summary judgment
for the agency, reasoning that it never employed Tibbs and
thus could not have discharged her, and that in any event,
there is no evidence of retaliation. We affirm because Tibbs
cannot point to evidence from which a jury could reasonably
infer that any of her supervisors harbored retaliatory animus
against her. We do not resolve the question whether the Ad-
ministrative Office employed Tibbs.

I.  *Factual and Procedural Background*

Because we are reviewing a grant of summary judgment,
we accept as true the evidence offered by Tibbs, the non-mov-
ing party, and she is entitled to the benefit of conflicts and the
evidence and any reasonable inferences in her favor. *Whitaker
v. Wisconsin Dep't of Health Servs.*, 849 F.3d 681, 682 (7th Cir.
2017). We summarize the facts without vouching for their ob-
jective accuracy, but in light of the applicable summary judg-
ment standard.

Before she was fired in September 2012, Tibbs worked as
the administrative assistant to the Chief Judge of the Circuit
Court of the Seventh Judicial Circuit, which covers six coun-
ties in Illinois, including Sangamon County where Tibbs
worked. The Chief Judge of the circuit, who serves for two
years, is responsible for the administrative functions of the en-
tire circuit. Each county also has a Presiding Judge who is re-
sponsible for administrative functions within that county.
When Tibbs was fired, Judge Richard Mitchell was coming to
the end of his two-year term as Chief Judge of the circuit.
Judge Leslie Graves was the Presiding Judge of Sangamon
County at the time, and she supervised Tibbs's "day-to-day
functions." Barbara Mabie, the trial court administrator for
the Chief Judge, also supervised Tibbs.

Tibbs twice took unpaid leave under the FMLA because of health issues—first from March to May 2011 and later from June to August 2012. The day she returned from leave in August 2012, Judge Graves gave her a letter saying she was being placed on paid administrative leave pending a disciplinary meeting with Chief Judge Mitchell. This disciplinary letter described several instances of misconduct. First, the letter noted, more than a year earlier, in March 2011, Tibbs had tried to change the assignment schedule for court reporters. Assigning court reporters was one of Tibbs's primary responsibilities, but she had asked the court reporters to keep this new system "quiet" while she tried it out. The change led to harsh criticism from one judge and controversy among the courthouse staff. The disciplinary letter from Judge Graves said that Tibbs had lacked authority to make the change and accused her of "insubordination, bringing the Court [into] disrepute or attempting to discredit the Court; and conduct unbecoming a judicial employee."

The second instance of misconduct described in the disciplinary letter had also occurred a year earlier, when Tibbs was preparing to return to full-time status after her first FMLA leave. Judge Graves had asked Tibbs to meet with her about returning to work full time, but according to the letter, Tibbs "disregarded" this instruction and instead contacted Chief Judge Mitchell about the issue. This action, too, was described as "insubordination" and "conduct unbecoming a judicial employee."

The disciplinary letter also described an incident that had occurred immediately before Tibbs took her second period of FMLA leave beginning in May 2012. A former court reporter, Lynn Ruppert, needed to retrieve notes for transcription from

the vault area of the Sangamon County Courthouse. She contacted Tibbs to gain entry. Ruppert twice looked for the box containing her notes, and at some point she reported to courthouse security that the box was missing. Tibbs herself later found the box, but in an unusual location in the vault and with the words "jury commission" written on the side visible to onlookers. The other side of the box had Ruppert's name and the case number on it. Tibbs concluded that the box had been recycled and simply misplaced. Tibbs used a marker to line through the words "jury commission" and then showed Ruppert where she had found the box in the vault. They then put the box "back up on the shelf the way that it should have been in the first place."

The disciplinary letter said that Tibbs had committed misconduct by failing to notify anyone that a box was missing from the vault and by taking Ruppert to the vault without authorization. Judge Graves apparently had told Tibbs several days earlier that another employee, Sandra Merrill, not Tibbs, was to "handle all of the vault requests" going forward. The letter also said that Tibbs had reshelved the box improperly "in such a way as to further inhibit its discovery."

Finally, the disciplinary letter said that Tibbs had "repeatedly attempted to undermine" her supervisor's authority by "making disparaging comments" to co-workers. Neither the comments nor the recipients of them have been disclosed.

The letter invited Tibbs to respond to the allegations at a meeting with Chief Judge Mitchell and others. The letter also said that Tibbs could respond in writing, but it warned that the meeting would proceed with or without her. Tibbs wrote Chief Judge Mitchell saying she would not attend. In that letter, she did not address the accusations against her. After she

had skipped the meeting and not refuted the allegations, Chief Judge Mitchell discharged her.

Tibbs then brought this suit. The only claim relevant on appeal is her claim against the Administrative Office of the Illinois Courts. Tibbs described the Administrative Office as "an agency of state government that has the responsibility of providing administrative assistance to the courts of the State of Illinois," and she characterized it as her employer. She alleged that the Administrative Office had retaliated against her for using FMLA leave.

The court granted the Administrative Office's motion for summary judgment for two reasons. First, the court found that the Administrative Office had not actually employed Tibbs and was not otherwise responsible for terminating her employment. Second, the court found that even if the agency did control and terminate Tibbs's employment, she had not offered sufficient evidence to support an inference that she was fired to retaliate against her for using FMLA leave.

II. *Analysis*

On appeal Tibbs argues that, despite the district court's contrary view, a jury could find that the Administrative Office employed her. She also asserts that the timing of her discharge and her disagreements with the official explanation are evidence from which a jury could find that the agency retaliated against her. The Administrative Office responds that, even if it was one of Tibbs's employers, it was not responsible for her discharge or any retaliatory motive behind it. Instead, the agency argues, Chief Judge Mitchell, whom Tibbs did not sue, had sole authority to fire her. The Administrative Office also

contends that Tibbs lacks evidence that she was fired in retaliation for taking FMLA leave.

As noted above, because we are reviewing a grant of summary judgment, we accept as true the evidence offered by Tibbs, the non-moving party, and we give her the benefit of conflicts in the evidence and all reasonable inferences in her favor. *Whitaker*, 849 F.3d at 682. We turn first to the issue of retaliatory intent. To survive summary judgment on her claim of retaliation under the FMLA, Tibbs had to point to evidence supporting a reasonable inference that she was fired because she took protected leave. See *Preddie v. Bartholomew Consol. School Corp.*, 799 F.3d 806, 819 (7th Cir. 2015). The principal evidence she offered in support of her claim was the timing. She was suspended immediately upon returning from the FMLA leave.

That timing is suspicious, of course. The problem is that suspicious timing alone is rarely enough by itself. A plaintiff must ordinarily present other evidence that the employer's explanation for the adverse action was pretext for retaliation. *Harden v. Marion County Sheriff's Dep't*, 799 F.3d 857, 864-65 (7th Cir. 2015); *Simpson v. Office of Chief Judge of Circuit Court of Will County*, 559 F.3d 706, 713–14 (7th Cir. 2009). The critical question is simply whether the inference of unlawful intent is reasonable (at summary judgment) or correct (at trial). See *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011) (occasionally "an adverse action comes so close on the heels of a protected act that an inference of causation is sensible"). Answering that question calls for some factual context. *Id*.

The Administrative Office introduced evidence that Tibbs was fired for facially legitimate reasons: ignoring Judge Graves's instruction not to handle vault requests from court

reporters, going over Judge Graves's head about returning to work full time, and creating a new assignment schedule for court reporters without the authority to do so. Tibbs argues that these reasons are phony and thus are pretexts to cover the Administrative Office's true retaliatory motives.

Pretext "involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 851 F.3d 690, 698 (7th Cir. 2017) (quoting *Harden*, 799 F.3d at 864). We have recognized that an employer's explanation for discharging a worker may sometimes be "fishy enough to support an inference that the reason must be discriminatory." *Loudermilk*, 636 F.3d at 315 (reversing summary judgment where employer claimed it fired plaintiff for taking photographs at workplace to support his claims of discrimination); see also *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 289–91 (7th Cir. 1999) (reversing summary judgment where employer claimed it fired plaintiff for "theft," consisting of eating a handful of taco chips from an open bag left in the employee break room).

Merely disagreeing with an employer's reasons does not meet this standard. A plaintiff must point to "evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate" the termination. *Carter v. Chicago State Univ.*, 778 F.3d 651, 659 (7th Cir. 2015), quoting *Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 808 (7th Cir. 2014). Where multiple reasons are given, as in this case, the plaintiff faces a greater challenge. Showing that just one reason was a pretext may not be enough. See *Simpson v. Beaver*

*Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 798 (7th Cir. 2015); *Bodenstab v. County of Cook*, 569 F.3d 651, 659 (7th Cir. 2009); *Fischer v. Avanade, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008).

Tibbs has failed to offer evidence sufficient to support an inference that any reason was false. First she asserts that she was never told not to accompany court reporters to the courthouse vault. But at her deposition, she acknowledged that she had accompanied Lynn Ruppert to the vault after being told by Judge Graves that, going forward, Sandra Merrill would "handle all of the vault requests." The following exchange then took place:

> Q.   But you took Lynn down to the vault after you had notification on May the 25th that Sandra was supposed to comply with those requests—
>
> A.   I did.
>
> Q.   —to go down to the vault?
>
> A.   I did, and I shouldn't have.

Thus, Tibbs's own understanding of the instructions from Judge Graves was she did not have authority to take Ruppert into the vault. By conceding that she should not have done so, Tibbs admitted misconduct. She asserts that the new policy limiting her access to the vault did not take effect until June 1, after she had taken Ruppert to the vault, pointing to an e-mail announcing that the new policy would take effect on that date. But that e-mail changes nothing about her testimony. That the policy did not become "official" until June 1 does not mean that Tibbs could ignore Judge Graves's instructions directly to her a few days earlier. Tibbs herself agreed that she should not have done so.

Tibbs has not argued on appeal that any of the other reasons given for firing her was false. Those reasons—her failed attempt at assigning court reporters to a new rotation a year earlier, her decision to speak with Chief Judge Mitchell instead of Judge Graves about returning to work, also a year earlier, and her alleged "disparaging comments" seeking to undermine supervisors—could be viewed as mistaken or unfair. Keeping in mind the summary judgment standard, we must acknowledge that Tibbs had not been disciplined before the action leading to her firing. Assigning court reporters was part of her job, and, according to the Administrative Office itself, she supposedly was employed by Chief Judge Mitchell, not Judge Graves. But the role of judges and juries is not to exercise our own judgment about management decisions and reasons. It is to decide whether the stated reasons were or could reasonably be found dishonest. Mere disagreement about the reasons given for Tibbs's discharge does not support an inference of pretext, particularly where Tibbs declined even to participate in the disciplinary process.

Tibbs did not dispute the testimony that Chief Judge Mitchell—who ultimately decided to fire her—"honestly believed" that each reason listed in the disciplinary letter supported her discharge. He confirmed by affidavit that he fired Tibbs for those reasons, that he did so independently, and that he made the decision only after Tibbs had declined to participate in the disciplinary process. It is not enough for Tibbs to argue that Chief Judge Mitchell was wrong in his assessment of her performance. She needs to point to facts showing that his explanation is unworthy of belief. See *Burton*, 851 F.3d at 698; *Harden*, 799 F.3d at 864. The district court correctly concluded that Tibbs failed to raise a genuine issue of fact about pretext.

The second issue in this appeal is whether the Administrative Office could be held responsible on Tibbs' claim under the FMLA. Only "employers" and those acting on their behalf face liability for retaliation under the FMLA. 29 U.S.C. § 2615(a) (creating liability for "employers" who interfere with FMLA rights); § 2611(4)(A)(ii)(I) (defining "employer" to include "any person who acts, directly or indirectly, in the interest of an employer"); see also 29 C.F.R. § 825.220(c) (explaining that FMLA's prohibition against interference encompasses retaliation for taking valid leave); *Lewis v. School Dist. #70*, 523 F.3d 730, 741 (7th Cir. 2008) (same). The Administrative Office argues that Chief Judge Mitchell, and not the agency, employed Tibbs. The Administrative Office also argues that even if it was one of Tibbs's employers, it was not responsible for the decision to fire her because Chief Judge Mitchell made that decision of his own accord.

This debate seems to miss the point that, no matter what person or agency Tibbs reported to, she was employed by the State of Illinois. The Administrative Office points to one opinion of this court indicating in dicta in a footnote that the state agency that employed the plaintiff, rather than the state itself, is the proper defendant in suit claiming employment discrimination. See *Holman v. Indiana*, 211 F.3d 399, 401 n.1 (7th Cir. 2000) (indicating that Title VII plaintiff could sue only Indiana Department of Transportation and not State of Indiana). In support of this comment, which addressed an issue not disputed in *Holman*, the footnote cited *Hearne v. Board of Education of the City of Chicago*, 185 F.3d 770, 777 (7th Cir. 1999), which held that Chicago teachers employed by the local board of education could not sue the Governor, the State of Illinois, or the Illinois Educational Labor Relations Board under Title

VII because none was plaintiffs' employer. The *Hearne* decision distinguished between *local* and *State* government entities, not the much finer difference between a State and its agencies. We will not wrestle this issue to the ground in this appeal, where the decision does not depend on it. We hope that plaintiffs, defendants, and district courts might handle such issues about State agency employees so that such technicalities will seldom if ever be decisive. If they do become decisive, we will deal with the problem then.[1]

The judgment of the district court in favor of the Administrative Office of the Illinois Courts on Tibbs's claim of FMLA retaliation is

AFFIRMED.

---

[1] Even if the FMLA does require such fine distinctions, we would be inclined in this case to find that the Administrative Office was Tibbs' sole employer. The Administrative Office admitted to employing Tibbs in its answer and never attempted to withdraw that admission through amendment. See *Crest Hill Land Dev., LLC, v. City of Joliet*, 396 F.3d 801, 805 (7th Cir. 2005) (concession in answer is binding judicial admission that "has the effect of withdrawing the question" from dispute for purposes of summary judgment).