In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 17-1701

ANGELA RILEY,

*Plaintiff-Appellant*,

*v.*

CITY OF KOKOMO, INDIANA HOUSING AUTHORITY,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court for the
Southern District of Indiana.
No. 1:15-cv-00391-WTL-DML — **William T. Lawrence**, *Judge*.

———————————

ARGUED JANUARY 18, 2018 — DECIDED NOVEMBER 20, 2018

———————————

Before SYKES and HAMILTON, *Circuit Judges*, and LEE, *District Judge*.*

LEE, *District Judge*. Angela Riley worked for the Kokomo Housing Authority for eight years before she was terminated in May 2014. During her employment, Riley suffered from sei-

———————————

* Of the Northern District of Illinois, sitting by designation.

zures, anxiety disorder, post-traumatic stress disorder, bipolar disorder, and depression, which required her to take various leaves of absence. She now claims that the housing authority improperly denied her requests for medical leave and retaliated against her for these requests by disciplining and terminating her, all in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* She also asserts that the housing authority failed to make reasonable accommodations and discriminated and retaliated against her in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* Finally, Riley claims that she was subjected to retaliation for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Fair Housing Act, 42 U.S.C. § 3617.

The district court entered summary judgment in favor of the housing authority on all claims. We affirm.

## I. BACKGROUND

Riley began working for the Kokomo Housing Authority ("KHA") as a front desk clerk in November 2008. KHA provides vouchers to low-income individuals and families to subsidize rent in privately owned rental properties throughout Kokomo, Indiana.

Prior to working at KHA, Riley had been diagnosed with bipolar disorder, anxiety disorder, depression, post-traumatic stress disorder, and frontal lobe seizures. Her physician's assistant certified that, due to these medical conditions, Riley required periodic breaks between one to eight hours per day, for up to two days per week. Beginning in March 2010, Riley requested, and KHA granted her, intermittent leave under the Family and Medical Leave Act ("FMLA").

KHA laterally transferred Riley to another position in April 2010, requiring her to split her time between two offices. When working in the second office, Riley was assigned to work in a closet. Riley felt that she was being punished for taking medical leave and repeatedly asked her superiors why she was being punished.

Eight months later, in December 2010, KHA promoted Riley to the position of low-rent-application processing clerk. As a result, she received a pay raise and was moved to a different workspace. Her duties in the new position included processing applications for public housing, interviewing applicants, maintaining a wait list and applicant files, and communicating with approved applicants when units became available.

Because her medical bills were mounting, Riley applied for social security disability benefits in 2011. Cheryl Morrow, KHA's Director of Human Resources, had suggested that Riley apply so that she would be eligible for Medicare and Medicaid benefits. But when a representative from the social security office informed Riley that she would have to quit her job to qualify for the benefits, Riley decided not to pursue it. As Riley sees it, Morrow's suggestion that Riley apply for benefits reveals an intent to discriminate against her on the basis of her disability.

In 2012, Riley submitted written complaints about several of her coworkers to Debra Cook, KHA's Chief Operating Officer. In them, Riley complained that a male coworker had a habit of wearing jeans that exposed his upper buttocks, that another coworker was treating clients rudely and disrespectfully without receiving any correction or discipline, and that

her female supervisor had poor personal hygiene and routinely hugged Riley and kissed her cheek. Cook addressed these concerns with the employees, and the issues were resolved.

During this same period, other KHA employees regularly complained to Cook about Riley. In short, they reported numerous incidents when Riley had treated them in a negative and demeaning manner.

In September and October 2013, Riley requested and received 43 days of FMLA leave from KHA. Riley sought additional medical leave for doctor appointments in February 2014. And, although she had exhausted her available leave time, KHA gave Riley time off to attend them.

In March 2014, KHA issued Riley a written warning for insubordination for allowing a KHA tenant to transfer from one housing unit to another without obtaining the necessary approvals. What happened is not in dispute.

When a KHA tenant wishes to transfer from one unit to another, KHA requires the tenant to submit a written transfer request. The request is reviewed by KHA, and if approved, the tenant's information is provided to someone in Riley's position so that arrangements can be made for the tenant to see the new unit.

On March 6, 2014, Riley arranged for a friend, a KHA tenant who wanted to move to another housing unit, to visit a new unit. However, the friend had not submitted a transfer application to KHA, nor had the friend been approved for a transfer. That same day, Riley provided the tenant's name to Margaret King, a KHA leasing specialist, and explained that her friend would be transferring from one unit to another.

King requested the tenant's file, and Riley assured her that the file would be forthcoming. Based on Riley's representations, King assumed that the transfer had already been approved and leased the new unit to Riley's friend.

Because KHA had not approved the transfer, it issued a verbal warning to King and a written warning to Riley for intentionally circumventing the transfer policy and for insubordination. According to Riley, she was falsely blamed for the unapproved transfer because her only involvement in the process was to schedule appointments for prospective tenants to view units.

Riley was involved in another incident a couple of months later. On Wednesday, May 7, 2014, Riley discovered that new tenants were moving into a housing unit that she believed was on administrative hold and unavailable to rent. She immediately contacted two KHA property managers, Tina Bellis and Carol Kindlesparker, and objected to the unauthorized move. To investigate whether the move was unauthorized, Bellis spoke to Cook, who explained that the move involved special circumstances.

When Bellis relayed this explanation to Riley, Riley became upset because she believed that Cook had circumvented KHA procedures with impunity, whereas she had received a written warning. Riley called Cook's office to discuss the matter, but was informed that Cook was busy. Riley then called the Indianapolis office of the United States Department of Housing and Urban Development ("HUD") to report the incident. The HUD representative told Riley that he would forward the information to his boss and that Riley should call HUD's civil-rights department.

Later that day, Bellis complained to Cook that Riley had been extremely confrontational and disrespectful when broaching the matter with her and Kindlesparker. In response, Cook directed Kindlesparker to tell Riley that Cook wanted to see her.

Although she disputes that Kindlesparker relayed this request to her, Riley admits that she called Cook later that day to say that she did not need to speak with her because she had already reported the matter to HUD. When Cook informed Riley that the people moving into the unit were cooperating with the Kokomo Police Department in an undercover operation, Riley retorted, "[I]f you have nothing to worry about and it's legit, then we don't have a problem." According to Riley, Cook also stated that whenever Riley reported anything to HUD, it costs KHA money (although Cook disputes this).

That same day, Cook decided to terminate Riley's employment based upon her refusal to come to Cook's office, her aggressive and unprofessional behavior toward Bellis and Kindlesparker, her history of misconduct, and her mistreatment of her coworkers.[1]  Cook prepared a written notice of

---

[1]    Cook attests that she alone decided to terminate Riley's employment, and Morrow states that she was not involved in the decision. Riley nonetheless contends that Morrow was involved in the decision because she was the Director of Human Resources. But this is pure speculation. *See Houlihan v. City of Chi.*, 871 F.3d 540, 554 (7th Cir. 2017) ("[S]peculation cannot defeat summary judgment."). Beyond Morrow's title, Riley offers nothing to establish Morrow's participation in the termination decision. *See* R. 524 ("Q:  Okay. Do you have any reason to dispute that Ms. Cook is the person that made the decision to terminate your employment? A: No.").

termination at 4:20 p.m. It was modified the following afternoon, and Cook signed the notice on Friday, May 9, 2014.

Riley did not come to work on Thursday, May 8, 2014. Nor did she come to work on Friday, May 9, 2014. Instead, on Friday, she called Morrow and left a voicemail message asking that two vacation or sick days be applied to her absences. And so Bellis and Morrow presented Riley with the termination notice on Monday, May 12, 2014.

## II. ANALYSIS

We review *de novo* the district court's grant of summary judgment and draw all reasonable factual inferences from the record in the nonmovant's favor. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018). Summary judgment is appropriate only if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

### A. FMLA Claim

Riley claims that KHA improperly interfered with her ability to take FMLA leave and disciplined and fired her in retaliation for seeking FMLA leave. To establish FMLA interference, an employee must prove that: (1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied FMLA benefits to which she was entitled. *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 761 (7th Cir. 2008). Retaliation claims under the FMLA require that: (1) the employee engaged in statutorily protected activity; (2) the

employer subjected her to an adverse action; and (3) the protected activity caused the adverse action. *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018).

The district court entered summary judgment in KHA's favor on Riley's FMLA claims, finding that the housing authority was not a covered employer because it did not have the necessary number of employees. The court also held that Riley had forfeited any argument that KHA was estopped from asserting that she was not an eligible employee given that it had approved her prior FMLA leave requests.

But we need not address either of those issues here because, even if Riley were correct on both counts, we may affirm on any basis appearing in the record, *see Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 718 n.4 (7th Cir. 2018), and Riley has failed to present evidence sufficient for a reasonable jury to find in her favor as to these claims.

First, Riley asserts that, on May 9, 2014, she asked for leave and was fired on account of her request. However, the undisputed facts show that Cook had already decided to terminate Riley on May 7, 2014, *before* Riley requested leave. Accordingly, no reasonable jury could find that Riley was terminated *because of* her FMLA leave request on May 9 or that KHA acted to interfere with her FMLA leave on that date. *See Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 597 (7th Cir. 2017) (district court properly entered summary judgment in employer's favor on FMLA interference and retaliation claims where employer decided to terminate employment before employee had requested FMLA leave); *see also Guzman v. Brown Cty.*, 884 F.3d 633, 640 (7th Cir. 2018) (FMLA retaliation); *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 828–29 (7th Cir. 2012) (FMLA interference).

Riley also claims that KHA retaliated against her for exercising her rights under the FMLA prior to May 9, 2014. In support, Riley relies on the following facts. She had requested (and was granted) FMLA leave from September 18 through October 31, 2013. She also sought medical leave days in February 2014, but was told that her leave time had been exhausted. Then, in March 2014, KHA issued Riley a written warning arising from the incident involving her friend, which Riley contends was in retaliation for her prior FMLA leave requests.

We have repeatedly held that "'[s]uspicious timing alone rarely is sufficient to create a triable issue,' and on a motion for summary judgment, 'mere temporal proximity is not enough to establish a genuine issue of material fact.'" *Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009) (quoting *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008). Rather, a "plaintiff must ordinarily present other evidence that the employer's explanation … was pretext for retaliation." *Tibbs v. Admin. Office of the Ill. Cts.*, 860 F.3d 502, 505 (7th Cir. 2017).

Here, it is undisputed that five months elapsed between the end of Riley's FMLA leave in October 2013 and the written warning. Furthermore, although Riley had requested leave in February 2014 for medical appointments and was told that her leave had been exhausted, she was allowed time off for her appointments nonetheless. Without more, these events, in and of themselves, are insufficient to establish a genuine issue of material fact to survive summary judgment. And Riley has not presented any other evidence from which a reasonable trier of fact could find that KHA's reason for issuing the written warning to Riley, *i.e.*, her involvement in the unauthorized transfer, was a pretext for FMLA retaliation. *See Harden v.*

*Marion Cty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015) (pretext "involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action") (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008)).

For her part, Riley points out that another employee involved in the unauthorized transfer received only a verbal warning, while others received no discipline of any kind. But it is undisputed that it was Riley who instigated the unauthorized transfer by arranging for her friend to see a new unit and notifying other employees that her friend's transfer would be approved even though her friend had not even filed a transfer application. In the face of this, Riley has presented no facts that call into question KHA's assessment that Riley's role made her more culpable than others.

Riley also claims that KHA improperly denied her leave for her medical appointments in February 2014, because it incorrectly calculated her leave time. But Riley concedes that KHA allowed her to take time off anyway. Given this admission, no reasonable jury could conclude that Riley was denied any FMLA benefits in February 2014, regardless of KHA's position that she had used up her leave. Accordingly, we conclude that the district court properly entered summary judgment as to Riley's FMLA claims.

B. ADA & Title VII Claims

Riley also argues that the district court erred by entering summary judgment with respect to her reasonable accommodation, discrimination, and retaliation claims under the Americans with Disabilities Act ("ADA"), as well as her retaliation claim under Title VII.

1.  ADA Reasonable Accommodation

First, Riley challenges the district court's determination that her ADA reasonable accommodation claim was beyond the scope of her EEOC charge. "An ADA plaintiff must file a charge with the EEOC before bringing a court action against an employer." *Whitaker v. Milwaukee Cty.*, 772 F.3d 802, 812 (7th Cir. 2014) (citing 42 U.S.C. § 12117(a)). "[A] plaintiff is barred from raising a claim in the district court that had not been raised in his or her EEOC charge unless the claim is reasonably related to one of the EEOC charges and can be expected to develop from an investigation into the charges actually raised." *Green v. Nat'l Steel Corp.*, 197 F.3d 894, 898 (7th Cir. 1999).

Riley asserted the following in her EEOC charge: (1) "The stress from work caused my disability to be aggravated for four days at the end of April and beginning of May, 2014, causing me to go to the hospital and to the doctor"; (2) "I requested FMLA leave for May 8, 2014, and vacation leave for May 9, 2014"; (3) "On Monday, May 12, 2014, I returned to work and was terminated for a reason that was not true"; and (4) "I believe that I am being discriminated against due to … my disability … ."

Our decision in *Green v. Nat'l Steel Corp.* is helpful here. In that case, the plaintiff alleged in her EEOC charge that her employer had fired her because of her disability. 197 F.3d at 897. Green then filed a lawsuit against her employer claiming, among other things, that her employer had terminated her employment and failed to accommodate her disability in violation of the ADA. *Id.* In determining that the failure to accommodate claim was outside the scope of the charge, we emphasized that "a failure to accommodate claim is separate and

distinct from a claim of discriminatory treatment under the ADA." *Id.* at 898. "In fact, the two types of claims are analyzed differently under the law." *Id.* "Therefore, they are not like or reasonably related to one another, and one cannot expect a failure to accommodate claim to develop from an investigation into a claim that an employee was terminated because of a disability." *Id.*

Similarly, Riley alleged in her EEOC charge that she had been terminated from her job because of her disability, but she omitted any allegation that KHA had denied her a reasonable accommodation under the ADA. Accordingly, we affirm the district court's ruling on this ground.

2.  ADA Discrimination & ADA & Title VII Retaliation

Next, we turn to Riley's appeal from the district court's ruling entering summary judgment as to her disability and retaliation claims under the ADA and on her retaliation claims under Title VII. In response to KHA's summary judgment motion, Riley merely listed twenty-five facts to support her discrimination and retaliation claims, leaving it up to the district court to surmise which facts supported which claim and how those facts operated to defeat summary judgment as to each claim. Riley faults the district court for entering summary judgment on the ground that she failed to develop coherent arguments, claiming that "facts usually speak for themselves … without arguments from counsel … ."

To the contrary, a party opposing a summary judgment motion must inform the district court of the reasons why summary judgment should not be entered. *Domka v. Portage Cty.*, 523 F.3d 776, 783 (7th Cir. 2008) (internal quotation marks omitted). "If it does not do so, and loses the motion, it cannot

raise such reasons on appeal." *Id.*; *see Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 720 (7th Cir. 2008) ("[I]t is axiomatic that an issue not first presented to the district court may not be raised before the appellate court as a ground for reversal."). "It is not the obligation of th[e] court to research and construct the legal arguments open to parties, especially when they are represented by counsel." *Beard v. Whitley Cty. REMC*, 840 F.2d 405, 408–09 (7th Cir. 1988); s*ee Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

The district court was understandably flummoxed by Riley's response to KHA's summary judgment motion. Riley's brief darted from topic to topic with no frame of reference to guide the district court in its analysis of the claims. Her scattershot approach also ignored significant issues raised by KHA. Perhaps the most puzzling aspect of Riley's response brief was the conflation of her discrimination and retaliation claims. We cannot fault the district court for refusing to expend its limited judicial resources to unknot this impenetrable tangle.

As it stands, even after considerable effort, we cannot glean from Riley's filings or the record any evidence that would support a claim that KHA acted with discriminatory or retaliatory intent. For example, to the extent that Riley bases any claim on her designation to a closet-sized office in 2010, such a claim is untimely. In her EEOC charge, Riley stated that she immediately complained to her supervisors that the assignment was in retaliation for requesting time off for her disability. Accordingly, a reasonable person in her position would have known at the time that she had a claim, and

filing a charge four years later came too late. *See Garrison v. Burke*, 165 F.3d 565, 569–70 (7th Cir. 1999) ("Acts that fall outside the statute of limitations may be joined to an act within the statute only if a reasonable person in the position of the plaintiff would not have known, at the time the untimely acts occurred, that she had a claim.").

By way of another illustration, Riley claims that KHA discriminated and retaliated against her by issuing the written warning and later terminating her. But, as we have discussed, the five-month span between her request for disability leave and the written warning, as well as the undisputed fact that the decision to terminate her employment occurred *before* she requested time off in May 2014, are insufficient to create an inference that her requests caused the adverse employment action. Furthermore, Riley cannot point to a single similarly-situated employee of KHA who received more favorable treatment but was not in her protected class or had not engaged in the protected activity. And, insofar as Riley posits that Morrow harbored animus against her because of her disability, there is no evidence that Morrow took part in the termination decision. What is more, Riley has offered no evidence to undermine KHA's proffered reasons for the warning and termination.

Lastly, as far as we can decipher, Riley (who was a tenant of KHA) also contends that KHA further retaliated against her after she was fired by issuing eviction notices to her for failing to pay a sewage bill and sending her a warning letter when she refused to allow a prearranged contractor into her unit. But Riley admits that her sewage bill was overdue and that, after she paid it, she was permitted to remain in her unit. It also is undisputed that Riley suffered no ill consequences as

a result of the warning letter and continued to reside in her unit until she voluntarily vacated it.

These are a few examples that we have been able to deduce from Riley's submissions. And they do nothing to support Riley's attempts to forestall summary judgment.

In the end, our adversary system relies on parties to raise issues and present them in the appropriate manner. *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 356 (2006). Because the district judge was not required to do Riley's work for her, we affirm the entry of summary judgment in KHA's favor on Riley's disability and retaliation claims under the ADA and retaliation claims under Title VII.

C. FHA Retaliation Claim

Finally, Riley challenges the district court's decision entering summary judgment as to her retaliation claim under the Fair Housing Act ("FHA"). To withstand summary judgment, Riley needed to show, among other things, that KHA "coerced, threatened, intimidated, or interfered with [her] on account of [her] protected activity under the FHA." *East-Miller v. Lake Cty. Highway Dep't*, 421 F.3d 558, 563 (7th Cir. 2005); *see Bloch v. Frischholz*, 587 F.3d 771, 783 (7th Cir. 2009); *White v. U.S. Dep't of Hous. & Urban Dev.*, 475 F.3d 898, 907 (7th Cir. 2007).

The FHA prohibits any housing practice that "discriminate[s] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, … national origin … . [, or handicap.]" *See* 42 U.S.C. §§ 3604(b), (f)(2). And, to ensure that

its statutory mandate is enforced, the FHA protects an individual's ability to report a discriminatory housing practice to a housing provider or other appropriate authority. *See* 24 C.F.R. § 100.400(c)(6).

As Riley sees it, she has created a genuine dispute of material fact as to this issue by presenting evidence that she called HUD to report what she believed to be fraudulent activity and was told to contact HUD's civil-rights department. In her view, this is enough to demonstrate (at least at the summary judgment stage) that she had engaged in protected activity and was fired as a result.

But there is no evidence that she called HUD to report a discriminatory housing practice. In fact, Riley admitted during her deposition that she called HUD to report Cook's failure to adhere to KHA procedures, conduct that Riley considered fraudulent, stating "When my CEO didn't follow directions, and she expects everyone else to, yes, that's when I called and reported her." Suffice it to say that reporting apparent mismanagement is not equivalent to reporting a discriminatory housing practice. And Riley herself concedes that she did not know whether the people moving into the unit in question were treated differently because of their race, color, religion, sex, familial status, national origin, or disability. Given this record, no rational jury could find that Riley reasonably believed she was reporting a discriminatory housing practice. *Cf. Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (stating that a Title VII retaliation claim requires that a plaintiff have a "sincere and reasonable belief" that "the complained-of conduct entailed a motive that Title VII prohibits"), *cert. denied*, 137 S. Ct. 1115 (2017).

Riley makes much of the fact that the HUD representative told her to contact HUD's civil-rights department. But, given her undisputed account of what she told him—which had nothing to do with housing discrimination—it is unreasonable to infer from this statement alone that Riley reasonably believed she was reporting a discriminatory housing practice. *See Roger Whitmore's Auto. Servs., Inc. v. Lake Cty.*, 424 F.3d 659, 669 (7th Cir. 2005) (to defeat summary judgment, plaintiff must present something beyond "bare speculation or a scintilla of evidence"). Because Riley does not present facts from which a rational jury could find that she had engaged in protected activity when she called HUD, summary judgment was appropriately entered as to her FHA retaliation claim.

As a final note, we agree with the district court that Riley's other arguments in support of her retaliation claim under the FHA were undeveloped. Having failed to first present these arguments to the district court, she may not raise them now as a ground for reversal. *See In re Veluchamy*, 879 F.3d 808, 821 (7th Cir. 2018).

The judgment of the district court is AFFIRMED.