In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-1567

WILLIAM H. MOSS,

*Plaintiff-Appellant,*

*v.*

TIMOTHY MARTIN, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 04-3217—**Jeanne E. Scott**, *Judge.*

ARGUED FEBRUARY 11, 2010—DECIDED AUGUST 2, 2010

Before KANNE, WOOD, and HAMILTON, *Circuit Judges.*

WOOD, *Circuit Judge.* Political patronage lies at the heart of this case—this time, favoritism based on political party affiliation in the Highway Sign Shop of the Illinois Department of Transportation ("IDOT"). William H. Moss worked as the Chief of that shop from 2000 until April 2004, when he was fired to make room for an employee chosen by the administration of then-Governor Rod Blagojevich. Moss sued a number of state officials

under 42 U.S.C. § 1983, asserting that his rights under the First Amendment and the due process clause were violated. The district court dismissed all claims on the pleadings, see FED. R. CIV. P. 12(c), but this court ruled that Moss was entitled to go forward with his First Amendment theory. See *Moss v. Martin,* 473 F.3d 694 (7th Cir. 2007) ("*Moss I*"). On remand, the district court ruled that the defendants were entitled to qualified immunity because they relied on the conclusion of Illinois's Central Management Services ("CMS") agency that Moss's job was "exempt" from the rule banning politically-based firings established in *Rutan v. Republican Party of Illinois,* 497 U.S. 62 (1990). The court therefore granted summary judgment to the defendants, and Moss's second appeal is now before us. Although we find that the decision to fire Moss probably fell afoul of the *Rutan* principle, we agree with the district court that the defendants were entitled to qualified immunity. We therefore affirm.

# I

Most of the details concerning Moss's job and the events leading to his firing were set out in *Moss I,* 473 F.3d at 697-98, and so we provide only a summary here. Moss began working as the Chief of IDOT's Highway Sign Shop in Springfield in September 2000. His immediate supervisor was Joe Hill, the Bureau Chief of Operations; Hill reported to Jack Hook, the Deputy Director of Highways. Moss was responsible for overseeing the fabrication and repair of all the highway signs scattered across

the State of Illinois; in that capacity, he supervised about 25 employees.

In January 2003, Illinois ended a long run of Republican governors when Rod Blagojevich, a Democrat, took office. About a year later, a personnel manager at IDOT named Jacob Miller happened to run across a newspaper article that mentioned that Moss was running for a position as a Republican precinct committeeperson for Sangamon County. Miller checked a few human resources records and discovered that Moss was on IDOT's list of so-called double-exempt employees. In plain English, that means that CMS, the state agency responsible for administering almost all state hiring, had concluded that his position was subject neither to the Illinois Personnel Code nor the Supreme Court's *Rutan* decision. Briefly, *Rutan* held that governments may not base employment decisions such as promotions, transfers, and recalls for low-level employees on political affiliation or support; to do so would be an impermissible infringement on the public employees' First Amendment rights. People in non-exempt positions, where political loyalty is a *bona fide* requirement, do not enjoy comparable protection. After Miller learned that Moss was double-exempt, he quickly shot off an email on December 22, 2003, to Robert Millette, the Director of Finance and Administration for IDOT, asking if Millette thought that Moss should be fired for supporting the political opposition. Millette answered yes and told Miller to start preparing the necessary paperwork.

A few months later, Scott Doubet replaced Miller. As far as this record shows, the two men never discussed

Moss's situation. But around that time a legislative liaison for the Blagojevich administration told Doubet to find a job for Joe Athey, whom Moss describes as a political loyalist for the Blagojevich team. Doubet looked around and decided to give Athey the job of Chief of the Highway Sign Shop. Millette and Timothy Martin, the Secretary of IDOT, signed off on Doubet's decision. Moss was fired on April 26, 2004, and Athey replaced him. Moss responded with this suit, which he filed against Martin (in both his individual and official capacities), Millette, and another IDOT employee. Gary Hannig, the current Secretary of the Department, has been substituted for Millette with respect to the official capacity claims.

## II

As we noted above, the First Amendment claim in Moss's case survived one round of appeal. Back in the district court, the parties filed cross-motions for summary judgment. Defendants' motion relied on qualified immunity, and so that is what the district court focused on. It recognized that there are two elements of a qualified immunity claim—first, that the defendants violated Moss's constitutional rights, and second, that those rights were clearly established at the time the defendants acted—and that it had discretion to address the second element first. See *Pearson v. Callahan,* 129 S. Ct. 808 (2009). Finding that judicial economy would be promoted by doing so in Moss's case, the court put to one side the question whether the defendants had violated

Moss's First Amendment rights and moved immediately to the issue whether they had done so in disregard of clearly established law.

The undisputed evidence, the court found, showed that the defendants, all from IDOT, relied on the decision of CMS to classify the position of Chief of the Highway Sign Shop as *Rutan*-exempt when they decided to fire Moss. CMS had made that designation in 1992, long before Moss took the position, at a time when Illinois had a Republican governor, and long before the Blagojevich administration took office. The court found that there was no rule requiring the IDOT personnel to second-guess the job description that CMS was using. In fact, the court concluded that even the decision in *Riley v. Blagojevich,* 425 F.3d 357 (7th Cir. 2005), which was handed down after the events in this case, supported the idea that political leaders were entitled to rely on existing state personnel descriptions unless the job description is systematically unreliable. Moss urged that he was eligible for the latter exception (disregarding the timing problem), but he presented no evidence that an unreliable process was used to develop the description for his position. The court also noted that the employing agency—here, IDOT—did not have the authority to change a designation by CMS that a position was *Rutan*-exempt. It also observed that none of the defendants independently evaluated Moss's position to determine whether political affiliation was a proper consideration for job actions.

### III

### A

Moss urges that the position of Chief of the Highway Sign Shop is too low on the totem pole to be classified as *Rutan*-exempt. This is the question that the district court did not reach, but because the inquiry into how clearly established these rules are touches on the underlying issue, we take a moment to discuss it.

The First Amendment prohibits a state employer from terminating the employment of a worker on the basis of her political beliefs unless political affiliation is an appropriate requirement for the position. See *Gunville v. Walker,* 583 F.3d 979, 983-84 (7th Cir. 2009) (citing *Branti v. Finkel,* 445 U.S. 507 (1980)). The only serious question here is whether Moss's job was one in which political affiliation was a valid consideration. The record is clear that he was a member of the Republican Party and that Millette knew this fact. Whether any of the other defendants knew is less clear.

The state argues that the exchange between Millette and Miller at the end of 2003 more or less dissipated, and nothing came of it. Miller testified that he was not sure what became of the paperwork he initiated to fire Moss. Only after Doubet took office and the legislative liaison approached him, looking for a job for Athey, did Moss finally lose his job. This, the state says, places an intervening cause between Millette and Miller's plan and the actual firing.

Moss counters that Millette hired Athey only to please the Democratic administration. Unfortunately, there is

little evidence to back up this assertion. All Moss has is Doubet's testimony that he told Millette and Martin that a legislative liaison in the administration had recommended Athey for a job. Doubet speculated that the liaison may have wanted to place Athey there because of his loyalty to the administration, but there is no evidence to substantiate that theory. For all anyone knows, Athey's appointment may have been motivated by nepotism, or by the desire to please a particularly powerful Republican legislator. If it were the latter, then Moss would be out of luck. He cannot succeed unless he can show that he was replaced by someone with different ideological beliefs. See *Hall v. Babb,* 389 F.3d 758, 765 (7th Cir. 2004). Even taking the evidence in the light most favorable to Moss, as we must on summary judgment, it is hard to find a genuine factual dispute on the question whether Millette's decision to hire Athey was based on Athey's political loyalties. *Cf. Cusson-Cobb v. O'Lessker,* 953 F.2d 1079, 1081 (7th Cir. 1992) (rejecting plaintiff's unsubstantiated claim that savvy government officials knew that she was a Republican because she had been appointed by the last administration).

The record nevertheless might permit a fact-finder to decide that Millette agreed to fire Moss because of Moss's active role in the local Republican party. When Doubet recommended hiring Athey in February or March 2004, the IDOT defendants may have been in the process of terminating Moss's employment because of his partisan comments. Miller testified that the hiring process for *Rutan*-exempt positions requires some 20 to 30 different steps; it is thus likely that the process

required to fire employees in those positions is equally protracted. Athey's appearance on the scene may have been just what Millette needed to complete the job of dismissing Moss.

The defendants' story requires one to believe that Millette agreed to fire Moss on political grounds, then backed away from that decision, and finally fired him a few months later because Doubet serendipitously selected Moss's position as the one *Rutan*-exempt spot that he felt fit Athey's skills. The connection between Millette's knowledge of Moss's political connections and Moss's discharge thus might raise the kind of question of intent that, on the merits, would best be left to the trier of fact. See *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 633 (7th Cir. 2009); *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009).

Moss's case against Martin is on shakier ground. No direct evidence, and nothing but speculative circumstantial evidence, indicates that Martin ever knew about Moss's political affiliation. Moreover, nothing indicates that Martin was aware of the content of the email exchange in December 2003 between Millette and Miller. Martin denied knowing that Moss was a member of the Republican party, and Doubet does not remember ever mentioning Moss's politics to Martin. Even if Martin, as Moss insists, knew that Athey had some kind of political connections, we have already explained why this vague knowledge is not good enough.

B

Even giving Moss the benefit of the doubt and assuming that there are genuinely disputed facts about the existence of a political motivation for his firing, there are two other hurdles he must pass before we would be required to reverse the district court. First, he would need to show that the job of Chief of the Highway Sign Shop was wrongly classified as *Rutan*-exempt, and second, he would need to show that this was so plain that the defendants should be denied qualified immunity.

On the first of those issues, Moss's case looks promising. Although the First Amendment prohibits government employers from taking most employees' political views into consideration when making job decisions, the Supreme Court has long recognized an exception to that rule for positions that involve confidential or policymaking responsibilities. See *Elrod v. Burns,* 427 U.S. 347, 367 (1976). In deciding whether a particular job falls within the exception, the court examines the inherent duties of the position. See *Riley,* 425 F.3d at 365. In *Moss I,* we found that the job description for the Chief of the Highway Sign Shop was inconclusive. 473 F.3d at 699. The Chief does not have access to politically sensitive information, but the defendants argue that he nonetheless is involved in "the making of policy and thus the exercise of political judgment." *Allen v. Martin,* 460 F.3d 939, 944 (7th Cir. 2006); *Kiddy-Brown v. Blagojevich,* 408 F.3d 346, 355 (7th Cir. 2005). They also describe the Chief's position as near the top of the IDOT hierarchy, since it is four rungs below the Secretary. This may depend on

whether the glass is half-full or half-empty: each rung has quite a few positions (for example, the Secretary oversees five divisions and five offices, and then the Division of Highways has ten different bureaus).

We could go on, but the best that we could do for Moss would be to find that the Chief's discretion is sufficiently circumscribed and his authority removed enough from the confidential or policymaking realm within IDOT that the job should have been covered by *Rutan* and the Personnel Code. Operating on that assumption, however, we still need to ask whether it was clearly established at the time the defendants fired Moss that such an action would violate his First Amendment rights. See *Pearson, supra; Saucier v. Katz,* 533 U.S. 194, 201 (2001); see also *Putrell v. Mason,* 527 F.3d 615, 621 (7th Cir. 2008) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."). The court thus cannot rely on the broad proposition that the First Amendment protects against certain political patronage firings; it must instead look to see if the violation was clear in the specific context of the case. See *Borello v. Allison,* 446 F.3d 742, 750 (7th Cir. 2006). This does not necessarily require the plaintiff to find a factually indistinguishable case on point, but if there is no such case, then he needs to offer a different explanation for why the constitutional violation is obvious. See *Flenner v. Sheahan,* 107 F.3d 459, 465 (7th Cir. 1997).

In concluding that the defendants reasonably believed that their discharge of Moss was lawful, the district court

emphasized that they relied on CMS's designation of the Sign Shop Chief position as exempt. CMS reached this conclusion by using criteria created by its outside legal counsel. This is one factor that militates in favor of granting qualified immunity. See *Davis v. Zirkelbach*, 149 F.3d 614, 619-21 (7th Cir. 1998) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)). It is not, however, dispositive, particularly here where we have already found that the job description on which both counsel and CMS relied was inconclusive. Furthermore, the weight that we place on CMS's reliance on advice of counsel depends on factors like how much information counsel had and how closely tailored the advice was to the position in question.

It is telling that CMS had classified the Chief's position as exempt under both *Rutan* and the Personnel Code in 1992, just two years after *Rutan* was decided. There is thus not a whiff of suspicion that either CMS or IDOT was manipulating the job description because of any interest that the incumbent administration at the time of Moss's firing might have had in expanding the scope of its own political patronage. It is also telling, given the unfortunate number of political patronage cases that have arisen over the years, that Moss cannot point to any closely analogous case to support his argument. The Sign Shop Chief's position lies somewhere between the extremes that have dominated our cases in this area. See *Riley*, 425 F.3d at 359 (chart). Given the uncertainty that litigants encounter in this somewhat murky area of the law, it is difficult for a plaintiff to avoid a qualified

immunity defense in a case of first impression unless she occupies a low rung on the bureaucratic ladder.

We conclude, therefore, that the defendants Moss has sued were entitled to qualified immunity. This leaves only one loose end to tie up. The qualified immunity defense protects governmental defendants from an action for money damages, but not from a suit for injunctive relief. Initially, Moss was asking for an injunction as well as damages. He has not pursued his request for an injunction on appeal, however, and so we deem it forfeited. For these reasons, the judgment of the district court is

AFFIRMED.