In the

# United States Court of Appeals
## For the Seventh Circuit

No. 16-2949

DANIEL HOULIHAN, *et al.*,

*Plaintiffs-Appellants*,

*v.*

CITY OF CHICAGO, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12-CV-6377 — **Harry D. Leinenweber**, *Judge*.

ARGUED APRIL 18, 2017 — DECIDED SEPTEMBER 8, 2017

Before EASTERBROOK, KANNE, and ROVNER, *Circuit Judges*.

KANNE, *Circuit Judge*. Chicago Police Department Unit 542
provides protective services for the city's mayor. The plaintiffs
here are current and former police officers who served on this
unit when Richard M. Daley was Mayor. But after Rahm
Emanuel took office, the department demoted them, appoint-
ing different officers in their stead.

The plaintiffs sued the City of Chicago, Emanuel, and numerous government officials, asserting two types of claims: *first*, that the defendants considered political loyalties when appointing officers to Emanuel's security detail in violation of the First Amendment and various consent decrees known as the *Shakman* decrees; and *second*, that the defendants considered race when selecting Emanuel's detail in violation of the Equal Protection Clause and various federal statutes.

In one way or another, each of the plaintiffs' claims failed: the district court either dismissed them at summary judgment or they were decided against the plaintiffs at trial. The plaintiffs appealed, alleging that the district court committed numerous errors in the proceedings below. Because we conclude that the court did not err, we affirm.

## I.   BACKGROUND

On April 24, 1989, Richard M. Daley began his term as Chicago's mayor. During his tenure, the Chicago Police Department assigned a security detail to protect him and his family. The plaintiffs here—Patrick Doyle, Daniel Houlihan, John Nolan, Robert Olson, Michael Padalino, John Pigott, Eusebio Razo, Veronica Rodriguez, Michael Roman, Richard Soto, and Carol Weingart—were once members of this detail, known as Unit 542. Although each held the rank of patrol officer, each was assigned to the security-specialist position, and as such, received a sergeant's pay.

In September 2010, Daley announced that he would not seek reelection. Soon after, Rahm Emanuel began his mayoral campaign. Several Chicago police officers volunteered to provide security and to perform other tasks relevant to his campaign, like driving him to various speeches and events.

On February 22, 2011, Emanuel was elected Mayor. The same day, the police department decided to assign a security detail to him until he was sworn in. The department asked an Emanuel aide named Michael Faulman to recommend officers for this detail. But Faulman was not experienced in security matters, so he asked Raymond Hamilton—one of the officers who volunteered on Emanuel's campaign—to recommend six people. Hamilton recommended himself and five of the other volunteers. All six of them had driven Emanuel to events during the campaign and knew their way around the city. Hamilton claimed that he based his recommendations solely on his and the other officers' merits.

Faulman knew these officers and thought that they acted professionally and were good drivers, so he adopted Hamilton's recommendations. The department then appointed the six officers to the transition detail. Hamilton's appointment was later rescinded because he was a SWAT officer and the department concluded that working on this detail was an inefficient use of SWAT resources. In the end, the transition detail consisted of five officers.

After finalizing the transition detail, the department began working on Emanuel's permanent security detail. The department's interim superintendent, Terry Hillard, took the reins on this task. Emanuel explained to Hillard that the detail should reflect the diversity of the city and should be "bare bones." (Tr. at 342.) Hillard considered the term diversity to include things like gender, people skills, language, and culture, in addition to race. And regarding the "bare bones" request, Hillard decided to reduce the number of positions from twenty-one officers and two commanders to sixteen officers and one commander.

Hillard chose Brian Thompson as the commander. Thompson had served as a commander on Richard M. Daley's detail. Hillard had known Thompson for twenty years and considered him to be competent.

To fill the sixteen officer spots, Hillard began his search with the officers already serving in Unit 542 on Daley's detail. Because Thompson had worked with these officers and knew them well, Hillard ask him to recommend some of them for Emanuel's detail. Thompson recommended ten officers; only two of them—Nolan and Roman—are plaintiffs here. Thompson claimed that he was embarrassed that he could not recommend more officers from Daley's detail, but in his view, these were the only ones warranting recommendation. He further claimed that he based his recommendations solely on the officers' abilities.

Hillard also solicited and received recommendations from Assistant Superintendents Beatrice Cuello, Eugene Williams, and James Jackson—trusted members of his command team.

About a week before Emanuel's inauguration, Hillard made the final selections for the sixteen officer spots on the detail. Irrespective of Emanuel's request for diversity, Hillard claimed that he did not base his selections on race. Instead, he relied on Thompson's and his command team's recommendations, appointing eight officers from Thompson's list and three officers from his command team's list. He filled the remaining spots with the five officers working on Emanuel's transition detail: he chose these officers not only because Emanuel was familiar with them and Daley wanted a smooth changeover between administrations but also because their work on the transition detail was relevant work experience.

The final detail contained seven white officers, five Hispanic officers, and five black officers (including Thompson).

None of the plaintiffs—all of whom are white or Hispanic—made the cut. The department immediately reassigned most of them as patrol officers. A few, however, were not reassigned right away. After Emanuel's May 16, 2011 inauguration, the department decided to assign a small courtesy detail to Daley. A Daley assistant requested that Nolan, Olson, and Roman serve on this detail. These officers retained the security-specialist title and pay until September 15, 2011, when the new superintendent, Garry McCarthy, decided to terminate the courtesy detail, finding it to be no longer necessary.

The plaintiffs filed a lawsuit in the Northern District of Illinois against Emanuel, Faulman, Hillard, Thompson, Cuello, Williams, Jackson, McCarthy, and the City of Chicago. The plaintiffs alleged that the individual defendants engaged in patronage hiring in violation of the First Amendment under 42 U.S.C. § 1983; the City of Chicago engaged in patronage hiring in violation of various consent decrees known as the *Shakman* decrees; the individual defendants, excluding Faulman, engaged in race discrimination in violation of both 42 U.S.C. § 1981 and the Equal Protection Clause under 42 U.S.C. § 1983; and the City of Chicago engaged in race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

The district court granted summary judgment, dismissing all of the claims against Emanuel, Faulman, Cuello, Williams, Jackson, and McCarthy—leaving only Hillard, Thompson, and the City of Chicago as defendants in the case. As for Hillard and Thompson, the court granted summary judgment in

the First Amendment claim on qualified-immunity grounds but denied summary judgment in the equal-protection and § 1981 claims. And as for the City, the court granted summary judgment in the Title VII claim but denied summary judgment in the *Shakman* claim. Finally, the court dismissed all of Nolan's, Olson's, and Roman's claims.

The equal-protection claim then went to a jury trial,[1] and the *Shakman* claim went to a bench trial. In the jury trial, the jury found for Hillard and Thompson. And in the bench trial, the court found for the City.

The plaintiffs timely appealed.

## II.   ANALYSIS

On appeal, the plaintiffs raise three issues. *First*, they argue that the district court misadjudicated their patronage claims. *Second*, they contend that the court committed reversible error in the equal-protection trial when excluding evidence of past racial discrimination and when instructing the jury. And *third*, they claim that summary judgment as to Nolan, Olson, and Roman was improper. We address each issue in turn.

### A.  The Patronage Claims

The plaintiffs' patronage claims include a First Amendment claim against Hillard and Thompson and a *Shakman* claim against the City of Chicago. Both of these claims rely on the same argument—that the defendants impermissibly considered political loyalties when selecting officers for Eman-

---

[1] During trial, the plaintiffs voluntarily dismissed their § 1981 claim.

uel's detail. Specifically, the plaintiffs allege that the department demoted them because they remained politically neutral and appointed different officers to the detail solely because those officers had volunteered to work on Emanuel's campaign. With five spots reserved for Emanuel's allies off the table, the plaintiffs claim that they were put at a disadvantage *vis-à-vis* the volunteer officers.

The district court granted summary judgment for Hillard and Thompson on qualified-immunity grounds. The claim against the City then proceeded to a bench trial. After that trial, the court found in favor of the City. The plaintiffs challenge these decisions on appeal, arguing that Hillard and Thompson are not entitled to qualified immunity and that the district court's factual findings in the bench trial lack supporting evidence. For the reasons that follow, we disagree.

1. *The First Amendment Claim*

The First Amendment generally prohibits government employers from considering one's political views when making employment decisions. *Moss v. Martin*, 614 F.3d 707, 711 (7th Cir. 2010). Nevertheless, political loyalty may be a valid job requirement in two situations. The first is when the job involves policymaking, which entails exercising political judgment. *Davis v. Ockomon*, 668 F.3d 473, 477 (7th Cir. 2012). And the second is when the job gives one access to his boss's confidential, politically-sensitive thoughts. *Id.*[2] The reason for

---

[2] Although the Supreme Court has abandoned the "policymaker" and "confidential employee" labels for a case-by-case analysis on whether it is appropriate to consider politics, these labels still "accurately describe the vast majority of offices that fall within the realm of legitimate patronage." *Davis*, 668 F.3d at 477.

this latter exception is that "[y]ou cannot run a government with officials who are forced to keep political enemies as their confid[ants]." *Soderbeck v. Burnett Cty., Wis.*, 752 F.2d 285, 288 (7th Cir. 1985).

At summary judgment, Hillard and Thompson invoked this second exception, arguing that they were entitled to qualified immunity because security specialists are confidential employees. To thwart qualified immunity, the plaintiffs had to prove two things: "first, that the facts alleged describe a violation of a protected right; and second, that this right was clearly established at the time of the defendant's alleged misconduct." *Mordi v. Zeigler*, 770 F.3d 1161, 1163–64 (7th Cir. 2014).

The district court determined that the plaintiffs failed to prove the second point—that, at the time of their reassignment, the law clearly established that security specialists are nonconfidential employees. Accordingly, the court held that Hillard and Thompson were entitled to qualified immunity and dismissed the claim on summary judgment.

We review the court's decision to grant summary judgment on qualified-immunity grounds *de novo*. *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013). In our review, we need not decide whether Hillard and Thompson actually committed the alleged misconduct; instead, we view the facts in the light most favorable to the plaintiffs and decide whether Hillard and Thompson are nonetheless entitled to qualified immunity. *See Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006).

"Qualified immunity protects officers performing discretionary functions from civil liability so long as their conduct does not violate *clearly established* statutory or constitutional

rights that a reasonable person would know about." *Mustafa v. City of Chi.*, 442 F.3d 544, 548 (7th Cir. 2006). Although the First Amendment typically prohibits government employers from making politically motivated employment decisions, a court's qualified-immunity analysis cannot simply rely on this general principle; rather, the court must determine whether there was a clear violation in the specific context of the case. *Moss*, 614 F.3d at 712. Indeed, qualified immunity ensures that government officials had notice that their conduct was unlawful before enduring litigation. *White v. City of Markham*, 310 F.3d 989, 993 (7th Cir. 2002). These officials are thus entitled to some degree of certainty in the law.

Given the "considerable uncertainty [that] exists in the area of patronage law," it is often difficult to prove that a government official violated a clearly established right by considering politics when making an employment decision. *Flenner v. Sheahan*, 107 F.3d 459, 465 (7th Cir. 1997). The reason for this uncertainty is that determining whether it is permissible to consider politics is a highly fact-specific inquiry—one that requires considering "a wide range of government positions, which in turn involve an endless variety of job responsibilities and varying degrees of discretion and autonomy." *Id*. Between the low-level government worker (who typically receives protection from patronage hiring and firing) and the confidential employee (who receives no such protection), there are numerous government positions for which the propriety of patronage-based employment decisions "has depended largely on the courts' juggling of competing constitutional and political values." *Upton v. Thompson*, 930 F.2d 1209, 1213 (7th Cir. 1991). For that reason, "it is difficult to imagine how any plaintiff … could have a clearly established right to be free from patronage dismissal unless a nearly identical case

had already been decided." *Pounds v. Griepenstroh*, 970 F.2d 338, 341 (7th Cir. 1992).

The plaintiffs have identified no such case. In fact, in *Greene v. Cook County Sheriff's Office*—decided *four years after* the police department reassigned them—the Northern District of Illinois granted qualified immunity after concluding that the law did not clearly establish that the security-specialist position is nonconfidential. 79 F. Supp. 3d 790 (N.D. Ill. 2015). The court noted that our case law regarding security specialists is unclear. *Id*. at 814. On the one hand, we have held that certain low-level government employees with limited access to confidential files—like court bailiffs and city investigators—are not necessarily confidential employees. *See Meeks v. Grimes*, 779 F.2d 417, 420–21 (7th Cir. 1985); *Matlock v. Barnes*, 932 F.2d 658, 665 (7th Cir. 1991). On the other hand, we have held that a government worker who had a close relationship and direct access to a policymaker held a confidential position and thus was not protected from termination for political reasons. *See Benedix v. Vill. of Hanover Park, Ill.*, 677 F.3d 317, 320 (7th Cir. 2012). The court found that security specialists fell somewhere in the middle: although they may not be the right-hand men and women of policymakers, they have "greater access to high-level and sensitive political conversations of a chief policymaking official than [do] the special investigators and bailiffs" that we have considered in other cases. *Greene*, 79 F. Supp. 3d at 814. Because of this uncertainty in our case law, the court held that the plaintiffs could not rely on existing precedent to circumvent qualified immunity. *Id*.

Although pointing to an analogous case is the typical way to defeat qualified immunity, s*ee Humphries v. Milwaukee Cty.*, 702 F.3d 1003, 1006 (7th Cir. 2012), it's not necessarily the only

way: "if there is no such case, then [a plaintiff] needs to offer a different explanation for why the constitutional violation is obvious." *Moss*, 614 F.3d at 712.

Here, the plaintiffs offer as their different explanation a series of consent decrees binding the City of Chicago. These decrees—known as the *Shakman* decrees—derived from a 1969 federal lawsuit titled *Shakman v. Democratic Organization of Cook County*, No. 69 C 2145 (N.D. Ill.). As a result of that litigation, the City entered into a 1972 consent decree prohibiting it from "considering, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor." *O'Sullivan v. City of Chi.*, 396 F.3d 843, 848 (7th Cir. 2005). In 1983, the City entered into a new decree, expanding the previous one to cover hiring decisions. *Id*. at 848–49. Taken together, these decrees generally prohibit patronage-based employment decisions.

The plaintiffs note that certain government jobs receive no protection under *Shakman*. But these jobs are expressly delineated on an exempt list. And it is undisputed that the security-specialist position *is not* on this list, and thus, the job *is* protected from political considerations.

To enforce this protection, as part of the City's hiring plan, the Chicago Police Department issued Notice 07–47, which states that political considerations may not factor into employment decisions regarding security specialists. In fact, the notice explicitly requires those involved in the hiring process to sign a form certifying that "[p]olitical reasons or factors"—which include "[t]he fact that the job applicant worked in a political campaign"—played no role in the hiring. (R. 297-48

at 2.) Thompson signed one of these forms for each of the five volunteer officers appointed to Emanuel's detail.

Based on the *Shakman* decrees and the City's measures to enforce them, the plaintiffs contend that Hillard and Thompson had notice that it was unconstitutional to consider politics when appointing security specialists.

We disagree. Although the *Shakman* decrees reflect one of the First Amendment's proscriptions—that is, the general prohibition of patronage-based employment decisions—the decrees are not an edict encapsulating the contours of the constitutional rule; the decrees instead are the result of settlement between the parties to litigation. The *Greene* court held as much when dismissing a similar claim on qualified-immunity grounds, observing that the exempt list is "the product of negotiation between the parties rather than the result of an in-depth analysis of each position's unique functions." 79 F. Supp. 3d at 819. Thus, "[a]bsence from the list could … be the result of horse trading between the parties, of simple oversight, or of some other factor related to the negotiations." *Id*.

The record here supports that proposition. As Hillard and Thompson note, the decrees prohibit the City from increasing the number of exempt positions by more than ten percent. This cap has nothing to do with the First Amendment. For example, the cap does not account for whether the positions on the exempt list are policymaking or confidential positions; rather, the cap is an arbitrary product of negotiation. Moreover, the record suggests that the parties negotiating the exempt list believed that the security-specialist position required confidentiality but nevertheless excluded the position because the list was meant to include only policymaking positions. Accordingly, just because the security-specialist position is not

included on the exempt list does not mean that the position is clearly nonconfidential.

To the contrary, whether the position is confidential is subject to debate. The plaintiffs note that security specialists have a separate office from the mayor, do not attend meetings, and do not provide policy advice. Hillard and Thompson, however, argue that security specialists accompany the mayor from the moment he leaves home to the moment he returns, drive the mayor around as he conducts business in his car, and protect the mayor's family.

The court agreed with Hillard and Thompson's position. As the court observed,

> The [security-specialist] duties involve close scrutiny of the mayor and his family which could involve observations of the family in intimate circumstances. They also involve driving the mayor with his close aides when they may well be discussing important and highly sensitive subjects. They also involve providing physical safety and satisfying emotional concerns that might arise from the fact that Emanuel is the first Jewish mayor of Chicago and had been Chief of Staff of the first African-American president of the United States. It is therefore not unreasonable for the mayor to wish to have the right to select [his] own security staff.

(R. 182 at 9–10.)

The evidence shows that a reasonable person not only could debate whether the security-specialist position is a confidential one, but in fact could conclude so. And because the position is arguably confidential, a patronage-based employment decision regarding the position—although illegal under

*Shakman*—does not necessarily entail a First Amendment violation. Accordingly, at the time of the plaintiffs' reassignment, Hillard and Thompson did not have notice that it is an obvious constitutional violation to consider politics when appointing security specialists. Hillard and Thompson are thus entitled to qualified immunity.

   2.  *The* Shakman *Claim*

Like the First Amendment, the *Shakman* decrees generally prohibit patronage-based employment decisions. A *Shakman* claim is one for civil contempt of court. *Coleman v. Dunlap*, 695 F.3d 650, 651 (7th Cir. 2012). To prove this claim, the plaintiffs had to present clear and convincing evidence showing that "a political reason or factor was the cause of [an] adverse employment action." *Bonnstetter v. City of Chi.*, 811 F.3d 969, 973 (7th Cir. 2016); *see Shakman v. Democratic Org. of Cook Cty.*, 533 F.2d 344, 351 (7th Cir. 1976).

The district court rejected the plaintiffs' claim, finding that politics did not factor into the City officials' decisions regarding the security-specialist position. On appeal, the plaintiffs argue the court's judgment lacks supporting evidence.

"We review the district court's factual findings for clear error." *Karlin v. Foust*, 188 F.3d 446, 457 (7th Cir. 1999). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Cent. States, Se. & Sw. Areas Pension Fund v. Neiman*, 285 F.3d 587, 594 (7th Cir. 2002) (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985)). Put differently, when

"there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Carpet Serv. Int'l, Inc. v. Chi. Reg'l Council of Carpenters*, 698 F.3d 394, 397 (7th Cir. 2012) (quoting *Nemmers v. United States*, 870 F.2d 426, 429 (7th Cir. 1989)).

After reviewing the record, we hold that the court committed no clear error. Let's recap what happened. After Emanuel was elected Mayor, the police department decided to assign a detail to him during the transition. The department sought officer recommendations from an Emanuel aide named Faulman. Faulman, however, had no experience with security matters, so he solicited recommendations from Hamilton—an officer he knew through the officer's volunteer work on Emanuel's campaign. Hamilton in turn recommended himself and five other volunteer officers. Faulman recommended those same officers, and the department appointed all of them except Hamilton to the transition detail; the department thought that Hamilton's experience as a SWAT officer overqualified him for the position. Ultimately, Hillard appointed these officers to the permanent detail.

The plaintiffs, who claim to be politically neutral, argue that the department's decision not to appoint them to the transition detail and instead to seek officer recommendations directly from the Emanuel campaign is clear evidence of political motivation. Not so. For one thing, it would have made no sense to reassign the plaintiffs to the transition detail when they were already working on Daley's detail: Daley was still Mayor and needed his own detail throughout the transition. For another thing, it made perfect sense to seek recommendations from the Emanuel campaign, given that the officers appointed would be responsible for protecting Emanuel's and

his family's lives. Moreover, the *Shakman* decrees expressly permit job recommendations from public officials and their aides "insofar as the basis for [their] recommendation[s] relates to the person's relevant work experience" and they have "personal knowledge of the person's work skills, work experience or other job-related qualifications." (R. 297-63 at 11–12.)

Therein lies the problem, say the plaintiffs, who claim that no one involved in this hiring process considered any of the volunteer officers' qualifications or experience. Regarding the transition detail, the plaintiffs argue that Faulman did nothing but pass along a list of officers that originated with the volunteers themselves—a list that the department then rubberstamped without any vetting or investigation; thereafter, Hillard appointed these officers to the permanent detail simply because "they were already with Emanuel." (Appellant's Br. at 28.) The plaintiffs assert that these facts show that the volunteers became security specialists, not because they were qualified, but because they volunteered to work on a political campaign.

But the record belies this assertion. Indeed, there is ample evidence suggesting not only that the volunteers were qualified but also that the City officials who hired them did so based on their qualifications. For example, the district court found that Faulman recommended the volunteer officers because they "were the best of the volunteers, *i.e.*, ones that had a history of not getting lost." (R. 281 at 7.) The record supports this finding. At trial, Faulman testified that he knew the officers that Hamilton recommended. Faulman further testified that the officers interacted professionally with Emanuel and were good drivers who knew their way around the city. Had

this not been the case, Faulman said he wouldn't have recommended them.

Likewise, Hillard had rational reasons for appointing the volunteers to the permanent detail. Hillard testified that Daley wanted a smooth changeover between the mayoral administrations. So in Hillard's mind, it made sense to appoint the volunteers: the volunteers knew Emanuel and his preferences and thus could be an invaluable source of information for the officers transferred from Daley's detail. Moreover, as the police department's director of human resources testified, the experience that the volunteers gained while working on the transition detail was relevant work experience that Hillard could consider when deciding whether to appoint them. Finally, as the court found, Hillard, who was sixty-seven years old at the time, had no incentive to play political gamesmanship at this late stage in his career: he did not know Emanuel or any of the volunteers, and he was to be the Interim Superintendent only through the transition period.

The plaintiffs make a few more arguments, which we address briefly. First, they take issue with the fact that Faulman's list of recommended officers originated with Hamilton—one of the volunteers. But as Hamilton testified, he considered only the officers' abilities—not political loyalties—when making his recommendations. The district court was free to credit his testimony.

The plaintiffs next claim that the district court erred by "overlook[ing] politically based employment decisions made by other City employees"—namely, those who forwarded the volunteers' names up the chain of command without knowing the volunteers' qualifications. (Appellants' Br. at 28–29.) We disagree that the court erred. It was enough that Faulman

knew the officers and vouched for their qualifications. A requirement that every person involved in the hiring process must reconfirm the qualifications of a recommended employee would be a tremendous misallocation of resources.

Finally, the plaintiffs argue that the City violated various aspects of the hiring plan it adopted to enforce the *Shakman* decrees. We need not delve into these alleged violations. The *Shakman* decrees allow only the named *Shakman* plaintiffs to seek enforcement of the City's hiring plan. (*See* R. 297-63 at 13.) The plaintiffs here are not named plaintiffs and thus are not the proper parties to bring this claim. *See Bonnstetter*, 811 F.3d at 973 (rejecting a similar attempt to hold the City liable for purported hiring-plan violations, explaining that such a "theory does not constitute a genuine claim under *Shakman*").

The record contains sufficient evidence supporting the district court's finding that City officials did not consider political factors when appointing Emanuel's detail. We need not disturb the court's decision.

*B.   The Equal Protection Clause Claim*

In addition to the patronage claims, the plaintiffs brought a discrimination claim under the Equal Protection Clause, alleging that Hillard and Thompson impermissibly considered race when selecting officers for Emanuel's security detail. Specifically, the plaintiffs contend that they lost their positions as security specialists because they are white and Hispanic. The district court denied Hillard and Thompson's motion for summary judgment on this claim, and the claim proceeded to a jury trial.

At trial, the plaintiffs had to prove that, in selecting officers for Emanuel's detail, Hillard and Thompson were "motivated in part by a racially discriminatory purpose." *Smith v. Wilson*, 705 F.3d 674, 681–82 (7th Cir. 2013) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270 n.21 (1977)). The plaintiffs' narrative began with Emanuel's request to Hillard that the detail be diverse. Hillard testified that he understood diversity to include race, and he admitted that he considered race as part of his selection process. Hillard further testified that, regarding the commander position, he chose Thompson—who is black—without having worked with him and without knowing his abilities as a commander.

Hillard instructed Thompson to recommend "the best diverse individuals from Mayor Daley's detail to be transitioned over to Mayor Rahm's detail." (Tr. at 273.) When Thompson submitted his recommendations, he said nothing of the officers' qualifications, but instead noted only the officers' races and genders. Hillard kept track of this information throughout the process. For example, at the bottom of a document containing the names of the sixteen officers selected for Emanuel's detail, Hillard wrote that the final detail included seven whites, five Hispanics, and four blacks. (R. 297-3 at 2.)

In selecting the final detail, Hillard heavily relied on Thompson's recommendations. Thompson admitted that he recommended all of the black officers from Daley's detail, including himself. Thompson further admitted that he did not conduct interviews before making his recommendations. In the end, all of the black officers on Daley's detail made the cut for Emanuel's detail. The plaintiffs, however, did not. At trial, one of the plaintiffs testified that, when he asked why he was

excluded from the detail, Thompson responded, "[T]he color of your skin is your sin." (Tr. at 532.)

Hillard and Thompson's evidence painted a drastically different picture. Hillard testified that, irrespective of the request for a diverse detail, he appointed none of the officers "because of their race." (Tr. at 326.) Instead, race was just one component of diversity, as was gender, people skills, language, and culture.

Hillard further testified that he did not appoint Thompson because Thompson is black; rather, Hillard had known Thompson for years and believed that he would be more familiar with the officers on the detail. For the same reason, Hillard thought that it made sense to accept Thompson's officer recommendations: after all, Thompson would be the one working with them long after Hillard stepped down as Interim Superintendent.

As for Thompson, Thompson denied considering race at all when making his recommendations. Although he indicated the officers' races and genders on his list of recommendations, he did so only because Hillard had asked for this information. At trial, Thompson offered a nonracial justification for each officer that he recommended. These justifications centered on the officers' skills, work ethic, experience, and professionalism. Moreover, he explained that he did not recommend the plaintiffs because of performance issues, bad judgment, poor demeanor, or because he believed that they would remain on Daley's courtesy detail. Finally, he completely disavowed the "color of your skin is your sin" comment, explaining that he doesn't speak in rhymes.

After hearing this evidence, the jury found for Hillard and Thompson. On appeal, the plaintiffs do not challenge the jury's verdict. Instead, they argue that the district court made two errors that skewed the jury's decision. *First*, they claim that the court improperly excluded evidence of the City's past racial discrimination. And *second*, they contend that the court gave an erroneous jury instruction that misstated the plaintiffs' burden of proof. For the reasons that follow, we disagree that the court erred.

### 1. *Evidence of Past Racial Discrimination*

To recall, the department appointed seven white officers, five Hispanic officers, and five black officers (including Thompson) to Emanuel's detail. The plaintiffs assert that this is so because of a quota system that the department has historically used when selecting officers for Unit 542—a quota system that requires that four blacks and four Hispanics serve on the unit. To prove this, the plaintiffs sought to introduce the testimony of a former police commander who would have explained the department's procedures for maintaining this quota system. The plaintiffs also wanted to present evidence showing that, in 1999, Hillard recommended Thompson for Daley's detail because the department told Hillard to select a black officer.

The plaintiffs claimed that the purpose of this evidence was to show discriminatory motive. Hillard and Thompson disagreed, arguing that this evidence was prejudicial and was truly offered for propensity purposes; so they moved *in limine* to exclude it under Federal Rules of Evidence 403 and 404(b). The court agreed with Hillard and Thompson, holding that "evidence of what may have occurred in the past would not

be particularly relevant and certainly would be discriminatory as far as balancing is concerned [under Rule 403] and also based on [the] general prohibition against propensity evidence [under Rule 404(b)]." (R. 295 at 2–3.) The court thus granted Hillard and Thompson's motion.

We review evidentiary rulings for abuse of discretion. *Manuel v. City of Chi.*, 335 F.3d 592, 595 (7th Cir. 2003).

The plaintiffs claim that the court abused its discretion in excluding their evidence of historical discrimination. They argue that such evidence is often relevant in race-discrimination cases, especially when the current defendants engaged in the discriminatory practices. Maybe so. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805 (1973) (noting that statistics on an employer's past practices might discern whether the employer's actions conformed to a general pattern of race discrimination); *Arlington Heights*, 429 U.S. at 267–68 (stating that "[t]he historical background of the decision is one evidentiary source" for "determining whether racially discriminatory intent existed"). But that doesn't mean that evidence of past practices is *always* admissible. Indeed, like all relevant evidence, a court may exclude such evidence after deciding that it runs afoul to the evidentiary rules. Fed R. Evid. 402.

District courts have broad discretion in making these decisions. *Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002). Here, the court determined that the plaintiffs' proposed evidence did not pass muster under Rule 403 on the ground that evidence of what happened years ago involving mostly different people is certainly prejudicial, yet not particularly probative. Moreover, the court found that the plaintiffs introduced the evidence primarily for propensity purposes—

essentially, to prove that City officials had a knack for discriminating; Rule 404(b) precludes introducing evidence for this purpose. These findings were rational, falling well within the court's discretion.

As a fallback argument, the plaintiffs contend that Hillard and Thompson opened the door to evidence of past discrimination at trial. The plaintiffs note that, during opening argument, counsel for the defense introduced an exhibit comparing the racial makeup of Daley's and Emanuel's security details and argued that "the evidence will show that the racial composition of Mayor Emanuel's security detail was virtually the same as it had been under Mayor Daley." (Tr. at 27.) The plaintiffs claim that this statement misled the jury into thinking that the racial composition of the two details was the same for benign reasons—not because of some unconstitutional quota system, which the plaintiffs could not prove existed without their evidence of historical discrimination.

We agree that the defense counsel's statement arguably opened the door. Nevertheless, "the Rules of Evidence do not simply evaporate when one party opens the door on an issue." *Duran v. Town of Cicero, Ill.*, 653 F.3d 632, 645 (7th Cir. 2011) (quoting *Manuel v. City of Chi.*, 335 F.3d 592, 597 (7th Cir. 2003)). The court's pretrial evidentiary rulings prohibiting the plaintiffs' evidence still applied.

At trial, the parties presented competing evidence on the discrimination issue. In the end, the jury believed Hillard and Thompson's story. Would the jury have reached the same conclusion had it heard the plaintiffs' evidence of past racial discrimination? It's a close call—but it's one that we are not the best equipped to make. The district judge was in the best position to rule on this issue, and he decided that the risk of

prejudice to Hillard and Thompson substantially outweighed the evidence's probative value. True enough, it wouldn't have been an abuse of discretion to admit the evidence; but it wasn't an abuse of discretion to exclude the evidence, either. *See Viramontes v. City of Chi.*, 840 F.3d 423, 432 (7th Cir. 2016) (Hamilton, J., concurring). We need not second-guess the court's decision.

### 2. *The Jury Instruction*

The plaintiffs also contend that the court gave an improper jury instruction. They sought an instruction explaining that they had the burden to prove that Hillard and Thompson's decision to demote them "was motivated in part by their race." (R. 257.) But the court's instruction was a little bit different: the court told the jury that the plaintiffs had to prove that Hillard and Thompson demoted them "because of their race." (Tr. at 857.) The plaintiffs contend that the court's instruction suggested that they had to prove that race was the *only* factor, rather than *a* factor.

Insofar as the court erred, the court cured the error immediately after making it. In the sentence following the purportedly flawed instruction, the court explained that the plaintiffs could meet their burden if they could show "that race contributed to [the] decision to remove them." (*Id.*) This further instruction clarified that the plaintiffs had to show that race was only a *contributing* factor, not the *sole* factor. Reversal is thus unwarranted.

### C. *Nolan's, Olson's, and Roman's Claims*

At last, we arrive at Nolan's, Olson's, and Roman's claims. To recall, the police department retained Nolan, Olson, and

Roman as security specialists assigned to Daley's courtesy detail. And they kept their positions until September 15, 2011 when McCarthy, who was Superintendent at the time, decided to terminate that detail. The court found that there was no evidence suggesting that McCarthy terminated the detail for political or racial reasons; rather, he simply believed that Daley no longer needed a detail. Because Nolan, Olson, and Roman suffered no adverse employment action, the court dismissed their claims at summary judgment.

On appeal, the plaintiffs invoke the so-called "cat's paw" theory of liability. This theory "refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Roberts v. Columbia Coll. Chi.*, 821 F.3d 855, 865 (7th Cir. 2016). In the plaintiffs' view, although McCarthy may have lacked discriminatory motive when terminating the courtesy detail, he made this decision based on advice from Thompson, who the plaintiffs claim had a discriminatory motive.

The only evidence supporting this position comes from McCarthy's deposition in which McCarthy admitted that he sometimes relies on his subordinates when making decisions. At no point, however, did McCarthy say that he relied on advice from Thompson when deciding whether to terminate the courtesy detail. To the contrary, McCarthy testified that he never spoke with Thompson about the security details. And even if McCarthy had relied on Thompson, it's puzzling to see why Nolan and Roman have any beef at all: indeed, Thompson recommended them for Emanuel's detail.

At any rate, the plaintiffs' evidence amounts to nothing more than speculation that Thompson influenced McCarthy's decision. And speculation cannot defeat summary judgment. *See McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). Accordingly, the district court properly dismissed Nolan's, Olson's, and Roman's claims.

### III.    CONCLUSION

For the reasons above, we AFFIRM the district court's decisions.